UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

INTERNATIONAL CONTROLS AND
MEASUREMENTS CORP.; and ICM
CONTROLS CORP.,

                        Plaintiffs,

         -against-                              5:12-CV-1766 (LEK/ATB)

HONEYWELL INTERNATIONAL, INC.,

                        Defendants.

_____

## MEMORANDUM-DECISION and ORDER

## I.    INTRODUCTION

In this patent-infringement action, Defendant Honeywell International, Inc. ("Defendant"),

moves pursuant to Federal Rules of Civil Procedure 12(b)(1) and/or 12(b)(6) to dismiss the Amended

Complaint filed by Plaintiffs International Controls and Measurements Corp. ("International Controls")

and ICM Controls Corp. ("ICM") (collectively, "Plaintiffs") for failure to assert a compulsory

counterclaim pursuant to Federal Rule of Civil Procedure 13(a)(1).   Dkt. Nos. 7 ("Amended

Complaint"); 10 ("Motion") at 2; 10-1 ("Memorandum").   Alternatively, Defendant seeks a transfer of

venue pursuant to either the first-filed rule or 28 U.S.C. § 1404(a).   Mot. at 2.   For the following

reasons, the Motion is denied in its entirety.

## II.    BACKGROUND

Defendant's Motion requires the Court to consider not only the factual and procedural

backgrounds of the instant action ("the New York Action"), but also those of the action filed by

Defendant in the U.S. District Court for the District of Minnesota on March 4, 2011 ("the Minnesota

Action") (collectively with the New York Action, "the Actions").   See Honeywell Int'l Inc. v. ICM

Controls Corp., No. 11-CV-0569, Dkt. No. 1 (D. Minn. Mar. 4, 2011) ("Minnesota Complaint"). The Court recites first the relevant facts and procedure of the Minnesota Action, the first-filed action, drawing the facts from the amended complaint in that action. See id. Dkt. No. 32; see also Dkt. No. 10-4 ("Minnesota Amended Complaint"). The Court then recites the relevant facts and procedure of the New York Action, drawing the facts from Plaintiffs' Amended Complaint.[1]

**A. The Minnesota Action**

*1. Factual Background*

Defendant, the plaintiff in the Minnesota Action, is a Delaware corporation with its principal place of business in Morristown, New Jersey. Minn. Am. Compl. ¶ 6; Am. Compl. ¶ 3. Defendant designs, manufactures, and sells throughout the United States a variety of electronic control devices for use in heating, ventilation, air conditioning, and refrigeration ("HVACR") products and systems. See Minn. Am. Compl. ¶¶ 23-92.

Defendant asserts in the Minnesota Action four patents relating to electronic controls in HVACR products. Id. ¶¶ 17-28, 110-28. Three of those patents are relevant to the instant dispute. The first is U.S. Patent No. 7,721,972, entitled "Appliance Control with Automatic Damper Protection," which issued to Defendant on May 25, 2010, and claims "technology related to methods and systems for

---

[1] In considering motions pursuant to Federal Rule of Civil Procedure 12(b)(1) or (6), a court must accept as true all well-pleaded factual allegations in the complaint. See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) ("To survive a motion to dismiss, a complaint must contain sufficient factual matter, *accepted as true*, to 'state a claim to relief that is plausible on its face.'" (emphasis added) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007))); Natural Res. Def. Council v. Johnson, 461 F.3d 164, 171 (2d Cir. 2006) ("When reviewing a district court's Rule 12(b)(1) determination of its subject matter jurisdiction . . . the court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff." (internal quotation marks and citations omitted)). The Court therefore takes the well-pleaded factual allegations in Plaintiffs' Amended Complaint as true and draws all reasonable inferences in Plaintiffs' favor.

operating a fuel-fired appliance that may include an operational hardware component such as a damper." Id. ¶ 23; Honeywell, No. 11-CV-0569, Dkt. No. 32-4 ("'972 Patent") at [45], [57]. The second is U.S. Patent No. 6,478,574, entitled "Pump Purge for Oil Primary," which issued to Defendant on November 12, 2002, and claims "technology related to burner or combustion control systems and apparatuses in which safety lockout is delayed in certain situations." Minn. Am. Compl. ¶ 17; Honeywell, No. 11-CV-0569, Dkt. No. 32-2 ("'574 Patent") at [45], [57]. The third is U.S. Patent No. 5,812,061, entitled "Sensor Condition Indicating System," which issued to Defendant on September 22, 1998, and claims "technology for measuring the value of an inherent variable quantity and displaying the variable quantity as a series of beeps or flashes of light." Minn. Am. Compl. ¶ 20; Honeywell, No. 11-CV-0569, Dkt. No. 32-3 ("'061 Patent") at [45], [57].

ICM, the defendant in the Minnesota Action, is a Delaware corporation with its principal place of business in North Syracuse, New York. Minn. Am. Compl. ¶ 7; Am. Compl. ¶ 2. ICM sells products in the United States that Defendant contends are "direct knockoffs" of four of Defendant's HVACR products. Minn. Am. Compl. ¶¶ 11-12. Three ICM products or series of products are relevant to the instant dispute. The first is the ICM 290, which allegedly copies the look and feel of Defendant's S8610U Universal Intermittent Pilot Gas Burner Control ("the S8610U"), an electronic control device that "provides ignition sequence, flame monitoring, and safety shutoff for furnaces, residential boilers, water heaters, and other heating appliances." Id. ¶¶ 12, 62; see also id. ¶ 64 ("[The ICM 290] utilizes the same appearance, configuration, casing, color, and even label configuration [as the S8610U]."). The second is the ICM 1500 series of products, which allegedly copy the look and feel of Defendant's R8184 Protectorelay Oil Burner Control ("the R8184"), an electronic control device that "provides automatic, nonrecycling control of combination oil burner heating and cooling systems when used with

a C554A Cadmium Sulfide (cad cell) Flame Detector and low voltage thermostat." Id. ¶¶ 12, 49, 53.

The third is the ICM 1510 series of products, which allegedly copy the look and feel of Defendant's

R7184 Interrupted Electronic Oil Primary ("the R7184"), an electronic control device that "operates to

control interrupted oil-fired appliances." Id. ¶¶ 12, 30, 34; see also id. ¶ 32 ("[The ICM 1510 series]

utilizes the same appearance, configuration, casing, color, and even label configuration [as the

R7184].").  The S8610U practices the '972 Patent, and the R7184 practices the '574 and '061 Patents.

Id. ¶¶ 42, 71.  The R8184 apparently does not practice any of Defendant's asserted patents. See id.

¶¶ 48-60.

### 2. Procedural Background

Defendant commenced the Minnesota Action on March 4, 2011, by filing a complaint against

ICM in the U.S. District Court for the District of Minnesota.  Minn. Compl.; FED. R. CIV. P. 3.

Defendant filed the Minnesota Amended Complaint approximately one year later.  Honeywell, No. 11-

CV-0569, Dkt. Nos. 31; 32; see also Minn. Am. Compl.

The Minnesota Amended Complaint asserts federal causes of action against ICM for patent,

copyright, and trade-dress infringement and for false advertising under the Lanham Act, as well a state-

law cause of action for deceptive trade practices.  See Minn. Am. Compl. ¶¶ 1-5, 110-201.  The

Minnesota Amended Complaint claims, *inter alia*, that: (1) because the ICM 290 "copies" the S8610U,

the ICM 290 infringes the '972 Patent; and (2) because the ICM 1510 series of products "copy" the

R7184, the ICM 1510 series of products infringes the '574 and '061 Patents.  Id. ¶¶ 43, 71, 110-24.

As of the filing date of this Memorandum-Decision and Order, the Minnesota Action remains

pending, with a dispositive motion deadline of January 2, 2014, and a trial-ready date of May 1, 2014.

See Honeywell, No. 11-CV-0569, Dkt. No. 182 ("Sixth Amended Scheduling Order").  See generally

id. Dkt. To date, the parties have completed significant discovery including: (1) the production of more than 100,000 pages of documents; (2) numerous interrogatories and depositions; and (3) substantial third-party discovery concerning the ICM 1500 and 1510 series of products.[2] See Mem. at 4-5; Woods Decl. ¶¶ 10-12, 14; Honeywell, No. 11-CV-0569, Dkt. Nos. 164, 178. Much of this discovery material is, however, subject to a protective order issued by the Minnesota district court. See Honeywell, No. 11-CV-0569, Dkt. No. 43. See generally id. Dkt. (containing multiple entries of documents filed under seal).

**A. The New York Action**

*1. Factual Background*

International Controls is a New York corporation with its principal place of business in North Syracuse, New York. Am. Compl. ¶ 1. ICM is a wholly-owned subsidiary of International Controls. Id. ¶ 2. For over 25 years, Plaintiffs, like Defendant, "have been in the business of making and selling electronic controls for use in heating, ventilation, air conditioning and refrigeration ('HVACR') products and systems." Id. ¶ 8.

International Controls claims to hold several patents relating to electronic controls in HVACR products, but it asserts only two such patents in the New York Action. Id. ¶¶ 9-11. The first is U.S. Patent No. 5,889,645, entitled "Energy Preservation and Transfer Mechanism," which issued to

---

[2] Third-party discovery as to these products apparently was necessary because of the condition of ICM's records, although Defendant does not offer any details on this subject. See Dkt. No. 10-3 ("Woods Declaration") ¶ 13. Plaintiffs assert, however, that such third-party discovery was necessary only for information regarding the ICM 1500 and 1510 series' channels of distribution, which information Plaintiffs contend relates only to Defendant's trade-dress infringement claims in the Minnesota Action. Resp. at 22 n.5. Defendant does not dispute this assertion. See generally Reply.

International Controls on March 30, 1999,[3] and states that it "relates to energy preservation and transfer mechanisms . . . incorporated into control circuits, e.g., furnace controls."[4] Id. ¶ 10; Dkt. No. 7-1 ("'645 Patent") col. 1, ll. 5-7. The second is U.S. Patent No. 6,222,719, entitled "Ignition Boost and Rectification Flame Detection Circuit," which issued to inventor Andrew S. Kadah ("Kadah") on April 24, 2001, and states that it "relates to gas burners of the type found in gas furnaces and is more particularly concerned with means for electronically igniting the burner and for detecting or providing the existences [sic] of flame after ignition." Am. Compl. ¶ 11; Dkt. No. 7-2 ("'719 Patent") col. 1, ll. 5-9. On April 12, 2005, Kadah assigned ownership of the '719 Patent to International Controls.[5] Am. Compl. ¶ 11. ICM holds the exclusive right to practice the inventions claimed in both the '645 Patent

_____

[3] Although the Amended Complaint states that the '645 Patent issued on *May* 30, 1999, the '645 Patent itself clearly states that it issued on *March* 30, 1999. Dkt. No. 7-1 ("'645 Patent") at [45]. The issue date of the '645 Patent is, however, irrelevant at this stage of the litigation. Furthermore, the '645 Patent is explicitly incorporated by reference into the Amended Complaint; therefore, the Court may look to it in deciding the Motion. Am. Compl. ¶ 10; see also Subaru Distributors Corp. v. Subaru of Am., Inc., 425 F.3d 119, 122 (2d Cir. 2005) ("In determining the adequacy of the complaint, the court may consider any written instrument attached to the complaint as an exhibit or incorporated in the complaint by reference, as well as documents upon which the complaint relies and which are integral to the complaint." (citation omitted)). Accordingly, the Court treats the '645 Patent as having issued on March 30, 1999.

[4] More specifically, the '645 Patent states that it is "concerned with a control circuit with a gas valve relay driver circuit which will actuate a gas valve when all driver components are in proper order, but will fail to actuate the gas valve otherwise." '645 Patent col. 1, ll. 7-11.

[5] The '719 Patent does not state that it was assigned to International Controls, and Plaintiffs did not attach a copy of the assignment document to the Amended Complaint or otherwise submit it to the Court. See generally Am. Compl.; '719 Patent. Compare '645 Patent at [73], [75] (identifying Kadah and Andrew W. Nguyen as the inventors but indicating assignment upon issuance from them to International Controls), with '719 Patent at [76] (identifying only Kadah as the inventor without an assignment field). Nevertheless, for the purposes of this Motion, the Court accepts as true Plaintiffs' allegation that the '719 Patent was duly assigned to International Controls. See Iqbal, 556 U.S. at 678.

6

and '719 Patent.[6]  Id. ¶ 12.

According to the Amended Complaint, Defendant manufactures and sells in the United States electronic control devices used in connection with furnaces, residential boilers, and other heating appliances that embody the inventions claimed in the '645 and '719 Patents.  Id. ¶ 13.  Specifically, Plaintiffs claim that the S8610U embodies these inventions.  Id.  ICM has not granted Defendant a license to use the '645 or '719 Patents in any of its products.  Id.

2. *Procedural Background*

ICM commenced the New York Action on November 30, 2012, by filing a Complaint against Defendant.  Dkt. No. 1 ("Complaint"); FED. R. CIV. P. 3.  The Complaint alleged that Defendant's manufacture and sale of the S8610U infringes the '645 and '719 Patents.  See Compl. ¶¶ 16, 21.  On December 19, 2012, Plaintiffs filed the Amended Complaint,[7] which left the original Complaint's substantive allegations substantially unchanged but added International Controls as a Plaintiff and identified it as the owner of the '645 and '719 Patents.  Compare Compl., with Am. Compl.

Defendant filed the instant Motion to dismiss or transfer venue on December 28, 2012.  Mot.  In the Motion, Defendant argues that: (1) the Amended Complaint should be dismissed because Plaintiffs' claims in the New York Action were compulsory counterclaims in the Minnesota Action, and Plaintiffs waived those claims by failing to assert them in the Minnesota Action; and (2) if the Court does not dismiss the Amended Complaint, the New York Action should be transferred to the District of Minnesota.  See Mem. at 7-20.  Plaintiffs have filed a Response, to which Defendant has filed a

_____

[6] However, no copy of the license agreement was attached to the Amended Complaint or otherwise submitted to the Court for its consideration.  See generally Am. Compl.; Dkt.

[7] The Amended Complaint was filed as of right pursuant to Federal Rule of Civil Procedure 15(a)(1)(A), which permits a party to amend its pleading once within 21 days after serving it.

Reply.  Dkt. Nos. 16 ("Response"); 28 ("Reply").

## III.  DISCUSSION

### A.  Motion to Dismiss

#### 1.  Rationale for a Dismissal of the New York Action

Federal Rule of Civil Procedure 13 provides for two types of counterclaims: compulsory and permissive.  FED. R. CIV. P. 13(a)-(b).  Rule 13(a) defines a compulsory counterclaim as one that: (1) "arises out of the transaction or occurrence that is the subject matter of the opposing party's claims"; and (2) "does not require adding another party over whom the court cannot acquire jurisdiction."  Id. 13(a)(1)(A)-(B).

"The purpose of [Rule] 13(a) is to permit a court to decide all related claims in one action, thereby avoiding a wasteful multiplicity of litigation."  In re PCH Assocs., 949 F.2d 585, 594 (2d Cir. 1991) (internal quotation marks and citation omitted); accord S. Const. Co. v. Pickard, 371 U.S. 57, 60 (1962).  A party who has a compulsory counterclaim in an action but fails to plead it therefore is barred from asserting that claim in a subsequent action.  E.g., Polymer Indus. Prods. Co. v. Bridgestone/Firestone, Inc., 347 F.3d 935, 938 (Fed. Cir. 2003); Critical-Vac Filtration Corp. v. Minuteman Int'l, Inc., 233 F.3d 697, 699 (2d Cir. 2000) (citing Baker v. Gold Seal Liquors, Inc., 417 U.S. 467, 469 (1974)).  See 6.  Some courts characterize this bar as deriving from the doctrine of res judicata, while others characterize it as based on the doctrines of waiver or estoppel.  See CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 1417 nn.7-9 (3d ed. 2008) (collecting and discussing cases).  In recent cases, both the Federal Circuit and the Second Circuit have espoused the former view.  See, e.g., Nasalok Coating Corp. v. Nylok Corp., 522 F.3d 1320, 1326 n.4 (Fed. Cir. 2008) (rejecting as circular whether res judicata would bar a subsequent suit on the purported

counterclaim absent the compulsory-counterclaim rule as a test for whether a purported counterclaim arose out of the same transaction or occurrence as a claim in a prior action); Angell v. U.S. Army Corps of Eng'rs, 149 F. App'x 34, 36 (2d Cir. 2005) ("If a litigant fails to raise a compulsory counterclaim as defined by Rule 13(a), she is barred by the doctrine of res judicata from raising it in a subsequent suit." (citing Critical-Vac, 233 F.3d at 699)); Polymer Indus., 347 F.3d at 938; WRIGHT ET AL., *supra*, § 1417, at n.7 (characterizing Polymer Industrial as applying the doctrine of res judicata).

Here, should the Court determine that Plaintiffs' patent-infringement claims in the New York Action are compulsory counterclaims in the Minnesota Action, the claims nevertheless would not be barred by res judicata because the Minnesota Action is still pending.[8] See Speed Prods. Co. v. Tinnerman Prods., 222 F.2d 61, 66-67 (2d Cir. 1955) ("To successfully assert res judicata in a subsequent action it is elementary that the judgment in the former action must have been final."); accord Proctor v. LeClaire, 715 F.3d 402, 411 (2d Cir. 2013) ("Under the doctrine of res judicata, or claim preclusion, a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action . . . ." (internal quotation marks and citations omitted)). Nor would it be appropriate for the Court to bar the claims on waiver or estoppel grounds, as "[n]otions of waiver or estoppel, rather than being applied more strictly than claim preclusion, often are used to mitigate the possible rigors of res judicata." WRIGHT ET AL., *supra*, § 1418. Thus, should the Court determine that Plaintiffs' claims are compulsory counterclaims, the

---

[8] As many courts have explained, "[n]othing in Rule 13 prevents the filing of a duplicative action instead of a compulsory counterclaim." E.g., Adam v. Jacobs, 950 F.2d 89, 93 (2d Cir. 1991); Internet Law Library, Inc. v. Southridge Capital Mgmt., LLC, 208 F.R.D. 59, 63 (S.D.N.Y. 2002); see also WRIGHT ET AL., *supra*, § 1418. Such a practice contravenes, however, "the purpose of [Rule 13(a)] in that it creates a multiplicity of actions, wastes judicial resources, and unduly burdens the litigation process." Internet Law Library, 208 F.R.D. at 63 (citations omitted). Hence the available judicial remedies discussed *infra*.

Court, in the prudential interests of judicial administration rather than through the application of a legal doctrine, will either stay the New York Action pending final judgment in the Minnesota Action or dismiss the New York Action with leave for Plaintiffs to seek permission from the Minnesota district court to assert the counterclaims in the Minnesota Action belatedly.[9]  See Inforizons, Inc. v. VED Software Servs., Inc., 204 F.R.D. 116, 118 (N.D. Ill. 2001) ("[I]n the interests of judicial administration, a court will generally either stay its own proceedings or dismiss an action once it learns that the action before it involves a claim that is properly characterized as a compulsory counterclaim in another pending federal action or is duplicative of parallel action already pending in another federal court." (citation omitted)); accord, e.g., Adam, 950 F.2d at 93 ("Ideally, once a court becomes aware that an action on its docket involves a claim that should be a compulsory counterclaim in another pending federal suit, it will stay its own proceeding." (internal quotation marks and citation omitted)); Internet Law Library, 208 F.R.D. at 63 (explaining that when a court is faced with a claim that is a compulsory counterclaim in another pending action, the court "can use the procedural devices of transfer, stay and consolidation to avoid multiple litigation and to effectuate [Rule 13(a)]" (internal quotation marks and citation omitted)).

### 2. Plaintiffs' Claims in the New York Action

The Federal Circuit has held that a party's purported counterclaim arises out of the same transaction or occurrence as the opposing party's claim, and is therefore compulsory, when any of the following three tests is met: (1) the legal and factual issues raised by the claim and counterclaim are

---

[9] Under Rule 13, a pleading must state any compulsory counterclaim that is ripe at the time of the pleading's service.  See FED. R. CIV. P. 13(a)(1).  If Plaintiffs' claims in the New York Action are compulsory counterclaims in the Minnesota Action, they would have been ripe when Defendant filed the Minnesota Complaint.  Thus, the counterclaims would be belated because Plaintiffs have already filed their answer in the Minnesota Action.  Honeywell, No. 11-CV-0569, Dkt. No. 7.

largely the same; (2) substantially the same evidence supports or refutes both the claim and the

counterclaim; or (3) there is a logical relationship between the claim and the counterclaim. Nasalok

Coating, 522 F.3d at 1325-26 (citing Polymer Indus., 347 F.3d at 937; Vivid Techs., Inc. v. Am. Sci.

& Eng'g, Inc., 200 F.3d 795, 801 (Fed. Cir. 1999)).[10]  Under each of these tests, "the question is the

---

[10] Plaintiffs and Defendant agree that Federal Circuit case law governs the compulsory-counterclaim issue. See Mem. at 7-8 (citing Vivid Techs., 200 F.3d at 801); Resp. at 8-9 (quoting Nasalok Coating, 522 F.3d at 1325). Even though the Federal Circuit would have jurisdiction over an appeal from a final decision in the New York Action because it is a patent-infringement action in which the Court's jurisdiction is based on 35 U.S.C. § 1338, see 28 U.S.C. § 1295(a)(1), it is unclear whether Federal Circuit or Second Circuit case law governs the compulsory-counterclaim issue. Where an action involves a procedural issue that is not "particular to patent law," the Federal Circuit will apply the governing law of the regional Circuit from which the action originated. See Acumed LLC v. Stryker Corp., 525 F.3d 1319, 1323-24 (Fed. Cir. 2008) (quoting Hallco Mfg. Co. v. Foster, 256 F.3d 1290, 1294 (Fed. Cir. 2001)); Polymer Indus., 347 F.3d at 937 (citing C&F Packing Co. v. IBP, Inc., 224 F.3d 1296, 1306 (Fed Cir. 2000)); Biodex Corp. v. Loredan Biomedical, Inc., 946 F.2d 850, 858-59 (Fed. Cir. 1991) (committing the resolution of a procedural issue to the Federal Circuit's jurisprudence where there is an essential relationship between the Federal Circuit's exclusive statutory mandate and the procedural issue). Although issues involving Rule 13 generally are procedural issues warranting application of regional Circuit case law, see Polymer Indus., 347 F.3d at 938, the Federal Circuit has applied its own law to Rule 13 issues on several occasions. In Polymer Industrial, the Federal Circuit found that "the compulsory nature of an infringement claim in response to a declaratory judgment action for patent noninfringement [under Rule 13(a)] and the resulting waiver and bar that occurs if not exercised warrant a uniform national rule" and thus application of Federal Circuit law. Id. Similarly, in Acumed, the Federal Circuit found that "[w]hether two claims for patent infringement are identical is a claim preclusion issue that is particular to patent law" and is therefore properly analyzed under Federal Circuit law. 525 F.3d at 1323 (internal quotation marks omitted). In light of Acumed and Polymer Industrial, the Court believes that the Federal Circuit would apply its own jurisprudence to the issue of whether a patent-infringement claim based on one set of patents is a compulsory counterclaim to a patent-infringement claim based on another set of patents. Whether the Federal Circuit would apply its case law to the issue of whether a patent-infringement claim is a compulsory counterclaim to a copyright- or trade-dress-infringement claim is less certain. See infra (discussing which claims in the Minnesota Action are relevant to the Court's compulsory-counterclaim analysis). Neither party has addressed this issue in its brief. Ultimately, however, which Circuits' law applies makes no difference in the instant case because the Second Circuit applies a "logical relationship" transaction-or-occurrence test, see Mopex, Inc. v. Am. Stock Exch., LLC, No. 02 Civ. 1656, 2002 WL 342522, at *6 (S.D.N.Y. 2002) (citing Critical-Vac, 233 F.3d at 699), which is subsumed in the Federal Circuit's third transaction-or-occurrence test. Under the Second Circuit's "logical relationship" test, "[a] claim is compulsory if 'a logical relationship exists between the claim and the counterclaim and [if] the essential facts of the claims are so logically connected that considerations of judicial economy and fairness

extent of factual overlap between what the plaintiff *must* establish to prove its claim and what the defendant *must* establish to prove its counterclaim." Id. at 1326. Defendant argues that these tests do not permit bright-line rules but instead require a case-by-case analysis of the legal and factual bases of claims and purported counterclaims. Reply at 3-4. The Court agrees, but with a caveat: for many of the reasons discussed *infra*, where, as here, the claim and purported counterclaim involve the assertion of different intellectual property rights against different products, the likelihood that any of the three tests will be met is very low.

Defendant also contends that claim preclusion (*i.e.*, res judicata) is an additional test for whether a purported counterclaim arises out of the same transaction or occurrence as a claim in another suit, but that it is only one of four tests and therefore not dispositive if unmet. Id. at 3 (citing Vivid Techs., 200 F.3d at 801). The Court disagrees. As Defendant points out, Vivid Technologies provided that the transaction-or-occurrence requirement could be satisfied by demonstrating that, absent the compulsory-counterclaim rule, res judicata would bar a subsequent suit on the counterclaim. 200 F.3d at 801. But the Federal Circuit later explicitly rejected this fourth transaction-or-occurrence test as circular. See Nasalok Coating, 522 F.3d at 1326 n.4. Defendant's argument reveals that it misapprehends both the nature of the compulsory-counterclaim rule and the purpose of the three remaining transaction-or-occurrence tests under the Federal Circuit's reasoning. The purpose of each of these three tests, as demonstrated by Nasalok Coating, is to determine whether res judicata would bar subsequent litigation of a purported counterclaim—the very question that Defendant insists is not dispositive. Consequently, Nasalok Coating does not "discourage the use of claim preclusion as a test for determining whether a

dictate that all the issues be resolved in one lawsuit.'" Id. (alterations in original) (quoting Critical-Vac, 233 F.3d at 699). This analysis does not differ materially from the analysis the Court conducts under the Federal Circuit's tests.

counterclaim is compulsory," as Defendant argues; rather, Nasalok Coating confirms that the compulsory-counterclaim rule derives from the doctrine of res judicata, and that the goal of each of the three transaction-or-occurrence tests is to determine whether res judicata would apply in a subsequent suit on a purported counterclaim. Reply at 3. Yet that does not mean that Nasalok Coating does not also require that the three tests be applied to the particular factual and legal circumstances of a case.

Before the Court can apply the three transaction-or-occurrence tests to the factual and legal circumstances of this case, it must first identify the relevant claims in the Actions. In the New York Action, it is undisputed that the relevant—and indeed only—claims are that the S8610U infringes the '645 and '719 Patents. In the Minnesota Action, however, the relevant claims are less clear. Defendant suggests that one of the relevant claims is that the ICM 290 infringes the '972 Patent because the ICM 290 allegedly copies the S8610U. See Mem. at 9 ("[Defendant] alleged that ICM had unfairly copied its S8610U and violated a patent that covered its S8610U technology."). But Defendant also seems to suggest that all of its infringement claims against the ICM 1500 and 1510 series of products, not just its patent-infringement claims relating to the ICM 1510 series of products, are relevant to the Court's transaction-or-occurrence analysis because the ICM 1500 and 1510 series both practice Plaintiffs' '645 and '719 Patents. Mem. at 3, 9 (explaining that the ICM 1500 and 1510 series of products are labeled with the '645 and '719 Patents, indicating that they practice those patents); Reply at 2. Plaintiffs agree that Defendant's patent-infringement claims in the Minnesota Action are relevant to the Court's analysis, but they offer no argument concerning Defendant's other infringement claims. See generally Resp. In an abundance of caution, the Court considers whether Plaintiffs' claims in the New York Action arise out of the same transaction or occurrence as any of Defendant's infringement claims in the Minnesota Action. The result is the same, however: Plaintiffs' claims in the New York Action are not

compulsory counterclaims in the Minnesota Action.

> ### a. Plaintiffs' Claims in the New York Action Do Not Arise Out of the Same Transaction or Occurrence as Defendant's Patent-Infringement Claims in the Minnesota Action

The Court rejects Defendant's attempts to draw a connection between Defendant's patent-infringement claims in the Minnesota Action and Plaintiffs' claims in the New York Action by arguing, essentially, that they concern the same products. Defendant first insists that the S8610U provides the necessary nexus between the claims in the two Actions because the ICM 290 allegedly copies the S8610U and thereby infringes the '972 Patent. See Mem. at 9; Reply at 1 ("[T]he product accused of practicing the patents [in the New York Action], the Honeywell S8610U, is also the subject of the underlying Minnesota Action."). This argument is unavailing because it "misplaces the focus of a patent infringement analysis, suggesting that it has something to do with comparing two products." Resp. at 11. To prevail on their respective patent-infringement claims, Plaintiffs and Defendant each must "establish by a preponderance of the evidence that the accused device[s] infringe[] one or more claims of the patent[s] either literally or under the doctrine of equivalents." Bayer AG v. Elan Pharm. Research Corp., 212 F.3d 1241, 1247 (Fed. Cir. 2000); see also Amstar Corp. v. Enivrotech Corp., 730 F.2d 1476, 1481 (Fed. Cir. 1984) ("The law of infringement requires that the asserted claims be compared with the products or processes accused of infringement." (citations omitted)). "Infringement is not determined . . . by comparison between commercial products sold by the parties." Amstar, 730 F.2d at 1481-82; accord AquaTex Indus., Inc. v. Techniche Solutions, 479 F.3d 1320, 1327-28 (Fed. Cir. 2007) ("'Infringement, either literally or under the doctrine of equivalents, does not arise by comparing the accused product . . . with a commercialized embodiment of the patentee.' [The patent-infringement] inquiry leaves no room for consideration of the patentee's product." (quoting Johnson

& Johnson Assocs. Inc. v. R.E. Serv. Co., 285 F.3d 1046, 1052 (Fed. Cir. 2002) (en banc))).  Thus, that

the ICM 290 allegedly copies the S8610U should not even enter into the Minnesota district court's

determination of whether the ICM 290 violates the '972 Patent.  Nor does the products' similarity

render Defendant's patent-infringement claims against the ICM 290 (or, for that matter, the ICM 1510

series) unique, which might in some way have created a link between them and Plaintiffs' claims in the

New York Action.  Common sense tells us that the similarity between an accused product and a

patentee's product will often be the impetus behind a patent-infringement suit.  Nevertheless, an

accused product does not violate a patent because it is similar to a product that practices that patent; the

accused product violates that patent, if at all, because it incorporates each limitation of the asserted

claim or claims.  Bayer AG, 212 F.3d at 1247.  It may be that the accused product satisfies this standard

precisely *because* it copies the patentee's product, but again, that is of no moment in the infringement

analysis.  The Court therefore finds that the ICM 290's alleged copying of the S8610U, without more,

does not satisfy any of the three transaction-or-occurrence tests.

    Defendant next attempts to draw a connection between its patent-infringement claims in the

Minnesota Action and Plaintiffs' claims in the New York Action by arguing that: (1) Defendant "will

have to prove that its S8610U has been a commercial success because of its intellectual property and

that ICM's 1510 series products have success because they use [Defendant's] intellectual property"; and

(2) Plaintiffs will have to prove "the mirror of this dynamic."  Reply at 5.  Defendant explains that the

parties will need to make these showings in their respective Actions because they "will impact damages

and a determination of obviousness in both actions."  Id. at 2.  Furthermore, Defendant argues that "the

fact finder in both cases will be tasked with deciding whether it is the features associated with

[Defendant's] intellectual property or those associated with ICM's patents that give rise to demand for

all these products." Id.

Defendant is correct that the source of both the patentee's products' and the accused products'

success might be introduced in the same Action.[11]  And if the Court assumes that the success of a

---

[11] Defendant has not clearly identified when or why the parties would need to address the source of the products' success or consumer demand. The Court finds, however, that they will need to do so: (1) if they assert affirmative defenses of obviousness at the infringement stage of their respective Actions; (2) if they request lost-profit damages; or (3) if they request injunctions enjoining the sale of the allegedly infringing products.

A party accused of infringing a patent may assert as a defense that the subject matter of the patent is obvious. See 35 U.S.C. § 103(a). This defense requires that the accused party show, by clear and convincing evidence, that a person of ordinary skill in the art would have found the claimed invention obvious in view of prior art defined in 35 U.S.C. § 102(a)-(b), (e), or (g). See In re Rosuvastatin Calcium Patent Litig., 703 F.3d 511, 517-18 (Fed. Cir. 2012). A patent holder can rebut a prima facie showing of obviousness by providing evidence of objective indicia of nonobviousness, Teva Pharms. USA, Inc. v. Sandoz, Inc., 876 F. Supp. 2d 295, 402 (S.D.N.Y. 2012) (citing Transocean Offshore Deepwater Drilling, Inc. v. Maersk Contractors USA, Inc., 617 F.3d 1296, 1304-05 (Fed. Cir. 2010)), which includes the extent of the commercial success of the patented invention. Mitsubishi Chem. Corp. v. Barr Labs., Inc., 718 F. Supp. 2d 382, 427 (S.D.N.Y. 2010) (citing Graham v. John Deere Co., 383 U.S. 1, 17-18 (1966); Stratoflex, Inc. v. Aeroquip Corp., 713 F.2d 1530, 1538-41 (Fed. Cir. 1983)), aff'd, 435 F. App'x 927 (Fed. Cir. 2011). Courts should give these objective indicia of nonobviousness "weight only where the[y] . . . are attributable to the inventive characteristics of the discovery as claimed in the patent." In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig., 676 F.3d 1063, 1079 n.6 (Fed. Cir. 2012) (citing, inter alia, Ormco Corp. v. Align Tech., Inc., 463 F.3d 1299, 1311-12 (Fed. Cir. 2006) (noting that a nexus must exist between a product's commercial success and the claimed invention)). Thus, because ICM has asserted the affirmative defense of obviousness in the Minnesota Action, Honeywell, No. 11-CV-0569, Dkt. No. 34 ¶ 202, Defendant will have the opportunity to put forward evidence that the S8610U is commercially successful because it incorporates the invention claimed in the '972 Patent. Likewise, if Defendant asserts the affirmative defense of obviousness in the New York Action, Plaintiffs will be entitled to put forward evidence that the ICM 290 and ICM 1510 series are commercially successful because they incorporate the inventions claimed in the '645 and '719 Patents.

To recover lost-profit damages, Plaintiffs must demonstrate the extent to which consumer demand for the S8610U is driven by its alleged use of the '645 and '719 Patents. See Ferguson Beauregard/Logic Controls, Div. of Dover Res., Inc. v. Mega Sys., LLC, 350 F.3d 1327, 1345-46 (Fed. Cir. 2003) (holding that in awarding lost-profit damages, a court should determine what part of the demand for the infringing product resulted from its use of the invention claimed in the patentee's patent). Similarly, Defendant must demonstrate the extent to which consumer demand for the ICM 290 and ICM 1510 series is driven by their alleged use of the '972 Patent and the '574 and '061 Patents, respectively. See id.

A patentee seeking a preliminary or permanent injunction must establish that it is likely to suffer

product based on its use of a patent and the consumer demand for that product based on its use of a patent both constitute essentially the same factual issue, there may be some overlap between the two Actions as to the S8610U and the ICM 290 and the ICM 1510 series.[12] But that potential issue overlap does not satisfy any of the three transaction-or-occurrence tests. First, even broadly construing the issue as whether these products' success/consumer demand stems from their use of one *or* the other party's patents, that still is only one factual issue common to the Actions. The first transaction-or-occurrence test requires, however, that the factual issues raised by the claims in the Actions be *largely* the same, meaning that a substantial number of factual issues raised by the respective claims must overlap, not that only one such issue must be substantially similar in both claims. For a similar reason, even if evidence of the source of the products' success/consumer demand supports or refutes both Plaintiff's claims in the New York Action and Defendant's patent-infringement claims in the Minnesota Action, the second transaction-or-occurrence test still is not satisfied. That test contemplates a greater overlap than a single factual issue among many. Finally, the Court finds that this potential overlap of one limited factual issue does not alone give rise to a logical relationship between Defendant's patent-infringement claims in the Minnesota Action and Plaintiffs' claims in the New York Action.

Furthermore, Defendant is incorrect in asserting that the fact finder in both Actions will be

---

irreparable harm in the absence of an injunction. <u>Winter v. Natural Res. Def. Council, Inc.</u>, 555 U.S. 7, 22 (2008); <u>eBay, Inc. v. MercExchange LLC</u>, 547 U.S. 388 (2006). Furthermore, the patentee must show that the irreparable harm results from consumers' demand for the allegedly infringing feature. <u>See</u> <u>Apple Inc. v. Samsung Elecs. Co.</u>, 695 F.3d 1370, 1376 (Fed. Cir. 2012) (holding that a patentee seeking a preliminary injunction must establish a strong causal nexus between the alleged harm and the alleged infringement by showing that consumers buy the allegedly infringing product because it is uses the invention claimed in the asserted patent, and not simply because of a larger feature of the product, of which the asserted patent covers only a part). Thus, to be entitled to an injunction, Plaintiffs and Defendant would need to make showings similar to those they would need to make in the context of establishing the amount of lost-profit damages to which they are entitled.

[12] <u>See</u> <u>supra</u> Note 11.

17

tasked with deciding whether consumer demand for the accused products arose from the opposing party's patents. To the contrary, the fact finder's sole focus in the situations in which she would need to consider consumer demand—determining the amount of lost-profit damages to award or whether an injunction should issue—is on whether demand for the patentee's products or the accused products arose from the *patentee's* asserted patents. See Ferguson Beauregard, 350 F.3d at 1345-46 (holding that in awarding lost-profit damages, a court should determine which part of the demand for the infringing product resulted from its use of the invention claimed in the patentee's patent); Apple, 695 F.3d at 1375 (holding that to meet the irreparable-harm prong of the injunction inquiry, "[t]he patentee must . . . show that the infringing feature drives consumer demand for the accused product"). Thus, the showings required in those situations would not produce overlapping evidence: in the Minnesota Action, Defendant would produce evidence that demand for the ICM 290 and ICM 1510 series arose from their use of Defendant's asserted patents, but in the New York Action, Plaintiffs would produce evidence that demand for the S8610U arose from its use of Plaintiffs' asserted patents. Therefore, this evidence, which presumably would be very similar to any evidence concerning the source of the products' success, does not satisfy any of the three transaction-or-occurrence tests.

Defendant argues further that the patent-infringement claims in the Actions are interrelated because: (1) ICM requested and received the circuit diagram schematics and marketing and sales information for the S8610U during discovery in the Minnesota Action; and (2) ICM identified the '645 and '719 Patents as relevant in its Rule 26(a) disclosures in the Minnesota Action. Reply at 2, 5. But these arguments once again miss the point of the three transaction-or-occurrence tests. As stated *supra*, the relevant question under each of these tests is "the extent of factual overlap between what the plaintiff *must* establish to prove its claim and what the defendant *must* establish to prove its

counterclaim." <u>Nasalok Coating</u>, 522 F.3d at 1326. Plaintiffs *must* establish in the New York Action that the S8610U practices the inventions claimed in the '645 and '719 Patents. Defendant, on the other hand, *must* establish in the Minnesota Action that the ICM 290 and ICM 1510 series practice the inventions claimed in the '972 Patent and the '574 and '061 Patents, respectively. That some evidence may have been produced during discovery in the Minnesota Action that could be relevant in the New York Action, but is not necessary to what Defendant must establish in the Minnesota Action, does not create the overlap that is required by the three transaction-or-occurrence tests. The same is true for Plaintiffs' identification of the '645 and '719 Patents in its Rule 26(a) disclosures, because, again, those patents have nothing to do with what Defendant must establish in the Minnesota Action and therefore create no relevant factual overlap with the New York Action.

In short, Plaintiffs' claims in the New York Action assert different intellectual property rights against different products than does Defendant's patent-infringement claims in the Minnesota Action. The result is that these claims raise substantially distinct factual issues. And while these claims all arise under the patent laws, that is not the level of generality intended by the first transaction-or-occurrence test's requirement that the legal issues raised by the claims be largely the same. That requirement has a narrower meaning, and one that normally will not be satisfied when, as now, the claim and purported counterclaim would require a court to determine whether different products infringe different patents.

Other courts that have confronted similar claims have reached the same conclusions. <u>See</u> <u>Clair v. Kastar</u>, 138 F.2d 828 (2d Cir. 1943) (L. Hand, J.); <u>IXYS Corp. v. Advanced Power Tech., Inc.</u>, No. C 02-03942, 2004 WL 135861 (N.D. Cal. Jan. 22, 2004); <u>Intermedics, Inc. v. Cardiac Pacemakers, Inc.</u>, Civ. No. 4-95-716, 1998 WL 35253496, at *1 (D. Minn. July 7, 1998) ("[T]he Plaintiff's Amended Complaint alleges that the Defendant directly infringed upon ten of its patents . . . . The First Amended

Answer . . . included four *permissive* Counterclaims, which charged the Plaintiff with infringing of four

of the Defendant's patents." (emphasis added)); Magnesystems, Inc. v. Nikken, Inc., 933 F. Supp. 944

(C.D. Cal. 1996); Metallgesellschaft AG v. Foster Wheeler Energy Corp., 143 F.R.D. 553 (D. Del.

1992); McNeil Mach. & Eng'g Co. v. Nat'l Rubber Mach. Co., 222 F. Supp. 85 (N.D. Ohio 1963);

Rubsam v. Harley C. Lonely Co., 86 F. Supp. 350 (E.D. Mich. 1949).[13]

In its Reply, Defendant argues that Clair is distinguishable because "the defendant in Clair only

joined the first suit to defend its customers—its patents and products were not at issue." Reply at 4.

But the defendant in Clair made a similar argument before the Second Circuit,[14] which decided that it

need not consider that argument because the claim "involved in the infringement of the [defendant's]

patent did not arise out of the transaction or occurrence that was the subject-matter of the plaintiffs'

complaint." 138 F.2d at 830 (internal quotation marks omitted). The Second Circuit therefore

reinstated the counterclaim, explaining further that the transaction or occurrence at issue in the

plaintiff's prior action on its patent was "the use, manufacture or sale of the defendant's [product] by

its customers," while the transaction or occurrence at issue in the defendant's counterclaim on its patent

was "the use, manufacture or sale by the plaintiffs of their own [product]." Id. This dynamic exists in

_____

[13] The Federal Circuit has not yet confronted the issue of whether a patent-infringement claim based on one set of patents is a compulsory counterclaim to a patent-infringement claim based on another set of patents.

[14] On appeal, the defendant in Clair argued that summary judgment dismissing its counterclaim should not have been granted for two reasons:

> The first is that a manufacturer who undertakes the defence of his customers, cannot plead as a counterclaim the infringement of a patent of his own; the second is that the plaintiffs did not in fact infringe the [defendant's] patent until after judgment had been entered in the [prior action].

138 F.2d at 830.

the instant case: the transaction or occurrence at issue in the Minnesota Action is ICM's manufacture and sale of its ICM 290 and ICM 1510 series of products; the transaction or occurrence at issue in the New York Action is Defendant's manufacture and sale of its S8610U. Clair's analysis and holding are not rendered inapplicable to the instant case merely because the defendant's customers, and not defendant itself, were using, manufacturing, or selling the products incorporating the invention claimed in the defendant's asserted patent.

Furthermore, contrary to Defendant's contentions in its Reply, IXYS is directly on point. See Reply at 4-5. In that patent-infringement action, the defendant filed an answer asserting a counterclaim for infringement of one of its patents but later sought to amend its answer to include an additional counterclaim for infringement of another of its patents. IXYS, 2004 WL 135861, at *1. One of the factors the district court analyzed before ultimately granting the defendant leave to amend was the compulsory or permissive nature of the defendant's proposed counterclaim. See id. at 5. The district court found the proposed counterclaim to be permissive, stating that the defendant "could almost surely bring it[] . . . in a separate action." Id. Although the district court went on to consider whether the defendant's original counterclaim (which was based on a patent very closely related to the patent asserted in the proposed counterclaim) caused the proposed counterclaim to become compulsory rather than permissive, the district court nevertheless rejected this idea because it was "unable to find any instance in which an otherwise permissive counterclaim ha[d] been transmogrified into a compulsory counterclaim in th[at] fashion." Id. at 5 n.2.[15]

_____

[15] Defendant also disputes the relevance of Kearns v. General Motors Corp., 94 F.3d 1553 (Fed. Cir. 1996), and Trading Technologies International, Inc., No. 10 C 715, 2011 WL 3157304 (N.D. Ill. July 26, 2011). See Reply at 4. Although those cases concerned alleged claim splitting by the plaintiffs, the analysis undertaken by the court in each case causes them to bear some relevance to the instant compulsory-counterclaim issue. Similar to the inquiry for determining whether a claim in an action is

Several cases that have not been discussed in the parties' briefs also are directly relevant to the compulsory-counterclaim question currently before the Court. See Magnesystems, 933 F. Supp. at 952-53 (deeming, without discussion, the defendant's proposed counterclaims alleging infringement of its patents to be permissive counterclaims to the plaintiff's patent-infringement claims); Metallgesellschaft, 143 F.R.D. 553; McNeil, 222 F. Supp. 85; Rubsam, 86 F. Supp. 350. Of particular note is Metallgesellschaft. In that case, the plaintiff alleged that the defendant infringed two of the plaintiff's patents by "operat[ing] facilities utilizing the processes and apparatus claimed" in those patents. Metallgesellschaft, 143 F.R.D. at 555. The defendant later brought a separate action alleging that the plaintiff infringed two of the defendant's patents in a similar way: by, *inter alia*, operating facilities equipped with apparatuses and using processes claimed in the defendant's asserted patents. Id. at 556. The plaintiff moved to dismiss the defendant's independent action on the ground that it was a compulsory counterclaim in the prior action. See id. at 556-57. In resolving the motion, the district court applied the Third Circuit's test for determining whether a purported counterclaim arose out of the

---

a compulsory counterclaim in a prior action, the inquiry for determining whether a party has improperly split their claims between two actions is whether claim preclusion would bar the second claim because it arises from the same set of "transactional facts" as the first claim. See Trading Techs., 2011 WL 3157304, at *3. In explaining the holding in Kearns, the Trading Technologies court stated:

> [W]here the patents involved in the two suits are different, Kearns takes the view that each patent creates a unique set of "transactional facts" for purposes of claim preclusion. By implication, the Federal Circuit rejects the view that a plaintiff must include in a single suit, at the risk of claim preclusion, every patent allegedly infringed on by the product at issue.

Id. at *4. Because the patents asserted by the plaintiff in the two actions at issue in Trading Technologies were different, the district court found that, under Kearns, each patent gave rise to an independent cause of action and therefore the second action was not barred by claim preclusion. Id. These holdings are relevant to the instant compulsory-counterclaim issue because it too involves determining whether claims on different patents must be brought in a single action or else be barred by claim preclusion.

same transaction or occurrence as a claim in a prior action. Id. at 558. The Third Circuit's test, as articulated by the district court, is similar to the Federal Circuit's three transaction-or-occurrence tests because it requires courts to consider the factors set forth in the first two of those tests in determining whether the third test—whether the claims have a logical relationship—is met. See id. at 558.[16] Although noting that there was indeed some legal and factual overlap between the plaintiff's claims in the prior action and the defendant's claims in its separately-filed action, the district court nonetheless found the defendant's claims not to be compulsory counterclaims because the plaintiff's and the defendant's "patents [were] not related *per se* and . . . the facilities at issue . . . [were] different." Id.

The Metallgesellschaft court's reasoning applies with equal force to the circumstances of the instant case. While Metallgesellschaft did not explain when two patents would be deemed to be related *per se*, the Court concludes that it is not when, as here, the patents cover similar or even the same subject matter. See Reply at 2 (arguing that Plaintiffs' asserted patents and Defendant's asserted patents are related because they "come from the same field of art: controls for fuel fired appliances"). This conclusion is supported by Metallgesellshaft as well as Clair, McNeil, and Rubsam. In Metallgesellshaft, both the plaintiff's and the defendant's patents covered apparatuses and methods for operating steam-generating "fluidized beds." 143 F.R.D. at 555 n.1, 556 & n.5. But, as just discussed,

_____

[16] The Metallgesellschaft court explained:

In order to determine whether a "logical relationship" exists between an opposing party's claim and a counterclaim, the court is directed to analyze several factors: 1) Are the issues in fact and law raised by the claim and counterclaim largely the same?; 2) Would *res judicata* bar a subsequent suit on defendant's claim absent the compulsory counterclaim rule?; and 3) Will substantially the same evidence support or refute plaintiff's claim as well as defendant's counterclaim?

143 F.R.D. at 558 (citation omitted).

23

the patents were not related *per se*. Id. at 558. Similarly, the patents at issue in Clair were both for a "steering stabilizer" on "motor-cars," yet the Second Circuit found that defendant's claims on its patent were not compulsory counterclaims to the plaintiff's claims on its patent. 138 F.2d at 830. In McNeil, "the patents owned by each of the parties were placed in the same general classification while being processed through the United States Patent Office, and further, . . . two [of the plaintiff's] patents were cited as references in the file of [the defendant's] patent." 222 F. Supp. at 86. This close relationship between the subject matter covered by the patents at issue in that case still did not render claims on one patent compulsory counterclaims to claims on the other patent. Id. ("Although the patents involved in these two actions relate to the same general subject of invention, there is nothing to indicate that the alleged infringements by each of the parties of the patents owned by the other are interrelated."). Finally, in ruling on a motion to dismiss the defendant's counterclaims alleging infringement of patents other than those asserted by the plaintiff, the Rubsam court held:

> Since the original suit filed by the plaintiff and this particular claim submitted by the counter-plaintiff are concerned with wheel balance weights, it might seem that the subject matter of both actions arise out of the same transaction or occurrence, and as such would establish the claim of the counter-plaintiff as a compulsory counterclaim, yet a thorough reading of the pleadings discloses therein two patents separate and distinct from the patents mention in the plaintiff's original cause of action, thereby making the counterclaim a permissive one.

86 F. Supp. at 351. Thus, even if Plaintiffs' and Defendant's patents relate to the same general subject of invention,[17] that fact does not make them related *per se*. Consequently, under the reasoning of Metallgesellschaft, claims on Plaintiffs' patents are not compulsory counterclaims to claims on

---

[17] According to Plaintiffs, they do not. Both the '645 and '719 Patents were classified by the U.S. Patent and Trademark Office under class 361, which covers "Electricity: Electrical Systems and Devices," and assigned to Patent Office Art Unit 2836. Dkt. No. 17 ("Hinderaker Declaration") ¶ 11. Defendant's asserted patents, on the other hand, were all assigned different classifications and assigned to different Patent Office Art Units. See id.

Defendant's patents.

Moreover, the Metallgesellschaft court's holding also relied on the fact that the plaintiff's facilities—which used equipment and processes that allegedly infringed the defendant's patents—and the defendant's facilities—which used equipment and processes that allegedly infringed the plaintiff's patents—were different.  143 F.R.D. at 558.  Translated into the terms of the instant case, the products at issue in Metallgesellschaft were different.  Because the products accused of infringing Plaintiffs' and Defendant's respective patents also are different, Metallgesellschaft further supports the Court's finding that Plaintiffs' claims in the New York Action are not compulsory counterclaims to Defendant's patent-infringement claims in the Minnesota Action.

The cases to which Defendant cites in its Memorandum and Reply do not support a finding that Plaintiffs' claims in the New York Action and Defendant's patent-infringement claims in the Minnesota Action arise out of the same transaction or occurrence.  See Mem. at 8 (citing In re EMC Corp., 677 F.3d 1351, 1358-59 (Fed. Cir. 2012); Critical-Vac, 233 F.3d at 698-700; CheckPoint Fluidic Sys. Int'l, Ltd. v. Guccione, No. 10-4505, 2011 WL 3268386, at *6-7 (E.D. La. July 28, 2011)); Reply at 4 (citing Rohm & Haas Co. v. Brotech Corp., 770 F. Supp. 928, 934 (D. Del. 1991)).  In re EMC Corp. is inapposite because the issue before the Federal Circuit was the appropriateness of severing multiple defendants from a patent-infringement action under Federal Rule of Civil Procedure 21.  See In re EMC Corp., 677 F.3d at 1355-60.  The only patents asserted in that case were the plaintiff's, and the Federal Circuit considered only the relatedness of *the defendants'* products.  See id.  Here, by contrast, both Plaintiffs' and Defendant's differing patents *and* products are at issue.

Critical-Vac and CheckPoint are not useful because, though they both support the general proposition that a claim will be a compulsory counterclaim to a claim in a previous action if the two

have a logical relationship, neither addresses the instant situation wherein one party's patent-infringement claims are alleged to be compulsory counterclaims to another party's patent-infringement claims. See Critical-Vac, 233 F.3d at 700-01 (holding that the plaintiff's claims for patent misuse were compulsory counterclaims in the defendant's prior action for patent infringement); CheckPoint, 2011 WL 3268386, at *6-7 (holding that the defendant's state-law counterclaims for violations of the Louisiana Unfair Trade Practices Act, tortious interference with business relations, and civil conspiracy were compulsory counterclaims to the plaintiff's claims for trademark infringement, false advertising, and unfair competition).

Finally, Rohm is distinguishable. There, the plaintiff brought suit in the District of Delaware ("the Delaware Action") alleging that the defendant infringed four of the plaintiff's patents. Rohm, 770 F. Supp. at 929. The defendant later brought a separate action in the Eastern District of Pennsylvania ("the Pennsylvania Action") against the plaintiff in the Delaware Action alleging antitrust and RICO violations and common-law fraud. Id. All of the allegations in the Pennsylvania Action arose "out of an alleged pattern of fraud on the Patent and Trademark Office ('PTO') practiced by [the plaintiff] in the prosecution and enforcement of ten patents," four of which were the patents asserted in the Delaware Action. Id. The district court held that: (1) the defendant's claims in the Pennsylvania Action were compulsory counterclaims to the plaintiff's patent-infringement claims in the Delaware Action; and (2) the fact that the defendant's claims in the Pennsylvania Action arose from six patents not at issue in the Delaware Action did not change the district court's conclusion. Id. at 934 ("Nor is our conclusion that the Pennsylvania claims are compulsory counterclaims undermined by the fact that the Pennsylvania actions involves six additional [plaintiff] patents and several additional parties."). But in Rohm, unlike in the instant action, the defendant was not asserting in the Pennsylvania Action that

the plaintiff in the Delaware Action was violating the defendant's patents; rather, the defendant was asserting that the plaintiff engaged in fraudulent activity with regard to its own patents that were the subject of the prior action. The circumstances of <u>Rohm</u> therefore do not speak to the circumstances of the instant case.

For all of the foregoing reasons, the Court finds that Plaintiffs' claims in the New York Action are not compulsory counterclaims.

<b><u>b.</u></b>  <u>Plaintiffs' Claims in the New York Action Do Not Arise Out of the Same Transaction or Occurrence as Defendant's Other Infringement Claims in the Minnesota Action</u>

Although Defendant appears to argue that Plaintiffs' patent-infringement claims in the New York Action arise out of the same transaction or occurrence as Defendant's claims for copyright and trade-dress infringement in the Minnesota Action, Defendant has not identified a single case in which a court reached such a conclusion with regard to a similar group of claims. <u>See generally</u> Mem.; Reply. Nor has Defendant provided any basis upon which the Court could reach that conclusion in the instant case. If, as the Court has already concluded, the legal and factual circumstances surrounding Plaintiffs' and Defendant's competing patent-infringement claims are sufficiently distinct to render Plaintiffs' claims permissive rather than compulsory, it stands to reason that the result should be, and is, the same with regard to Plaintiffs' patent-infringement claims and Defendant's copyright- and trade-dress-infringement claims, which claims arise from different legal theories and require different factual proof than patent-infringement claims.

For these reasons, the Court finds that Plaintiffs' claims in the New York Action do not arise out of the same transaction or occurrence as Defendant's copyright- or trade-dress-infringement claims in the Minnesota Action and therefore are not compulsory counterclaims. As a result, Defendant's

Motion, to the extent it seeks dismissal of Plaintiffs' Amended Complaint, is denied.

### B. Motion to Transfer Venue

Defendant requests an order transferring the New York Action to the District of Minnesota pursuant to either the so-called "first-filed rule" or 28 U.S.C. § 1404(a).[18] The Court addresses the appropriateness of such an order under each theory *infra*.

### *1. Transfer Pursuant to the First-Filed Rule*

Under the first-filed rule, when lawsuits relating to the same controversy have been filed in different courts, the first suit should ordinarily have priority and the later-filed suit should be dismissed. Oleg Cassini, Inc. v. Serta, Inc., No. 11 Civ. 8751, 2012 WL 844284, at *3 (S.D.N.Y. Mar. 13, 2012) (citing D.H. Blair & Co. v. Gottdiener, 462 F.3d 95, 106 (2d Cir. 2006)). Courts, in the exercise of their discretion to fashion an appropriate remedy in these circumstances, may also choose to stay or transfer the later-filed suit instead of dismissing it. See Merial, 681 F.3d at 1299 ("Under the first-to-file rule, a district court may choose to stay, transfer, or dismiss a duplicative later-filed action . . . ."); Maximum

---

[18] Although § 1404(a) and the first-filed rule may require courts to conduct similar convenience and interests-of-justice analyses, each constitutes an independent ground for granting a transfer. See Emp'rs Ins. of Wausau v. Fox Entm't Grp., Inc., 522 F.3d 271, 275 (2d Cir. 2008) (holding that the presumption in favor of the filed-filed suit may be rebutted where the "balance of convenience" favors the second-filed suit, and that the "factors relevant to the balance of convenience analysis are essentially the same as those considered in connection with motions to transfer venue pursuant to 28 U.S.C. § 1404(a)" (citation omitted)); see also Merial Ltd. v. Cipla Ltd., 681 F.3d 1283, 1299 (Fed. Cir. 2012) ("The 'first-to-file' rule *is a doctrine of federal comity*, intended to avoid conflicting decisions and promote judicial efficiency, that generally favors pursuing only the first-filed action when multiple lawsuits involving the same claims are filed in different jurisdictions." (emphasis added) (citations omitted)).

Neither the first-filed rule nor § 1404(a) is a procedural issue particular to patent law and therefore neither is committed to the jurisprudence of the Federal Circuit. See In re Link_A_Media Devices Corp., 662 F.3d 1221, 1222-23 (Fed. Cir. 2011) ("In reviewing a district court's ruling on a motion to transfer pursuant to § 1404(a), we apply the law of the regional circuit . . . ." (citing Storage Tech. Corp. v. Cisco Sys., Inc., 329 F.3d 823, 836 (Fed. Cir. 2003))); see also Acumed, 525 F.3d at 1323-24; Biodex, 546 F.2d at 858-59.

Human Performance, Inc. v. Dymatize Enters., Inc., Civ. No. 09-235, 2009 WL 2778104, at *2 (D.N.J. Aug. 27, 2009) ("[T]he [first-filed action] doctrine gives courts the power to dismiss, stay, or transfer a later-filed case." (citations omitted)); CBS Interactive Inc. v. Nat'l Football League Players Ass'n, Inc., 259 F.R.D. 398, 408-09 (D. Minn. 2009) ("The first-filed rule gives a district court discretion to dismiss a later-filed action or transfer it . . . ." (citations omitted)).  Defendant seeks transfer pursuant to the first-filed rule rather than dismissal.  See Mem. at 13-14.

For the first-filed rule to apply, the "claims, parties, and available relief" must not "significantly differ between the actions."  Id. (quoting Byron v. Genovese Drugstores, Inc., No. 10-CV-3313, 2011 WL 4962499, at *3 (E.D.N.Y. Oct. 14, 2011)); see also id. at *4 (stating that the "predicate for applying the first-filed rule" is similarity between the "claims, parties, and relief sought").  "However, the issues need not be identical, and the named parties need not be entirely the same provided that they represent the same interests."  Id.

Here, the first-filed rule does not apply because, for the reasons discussed at length *supra*, the Actions raise substantially distinct legal and factual issues.  See *supra* Part III.A.  And, like many of the cases Defendant cites in arguing that Plaintiffs' claims in the New York Action are compulsory counterclaims, the cases Defendant cites in support of its argument that the first-filed rule applies in the instant action are inapposite precisely because they involve a different array of claims that, unlike in the instant action, are substantially related both legally and factually.  See Mem. at 13 (citing Oleg Cassini, 2012 WL 844284, at *4-12; Wald v. Bank of Am. Corp., 856 F. Supp. 2d 545, 550 (E.D.N.Y. 2012)).  Therefore, if the Court is to transfer the New York Action to the District of Minnesota, it must do so pursuant to § 1404(a).

29

## 2. Transfer Pursuant to § 1404(a)

### a. Legal Standard

Section 1404(a) permits a district court to transfer a civil action to "any other district or division where it might have been brought." 28 U.S.C. § 1404(a). The purpose of the provision is to "protect litigants, witnesses and the public against unnecessary inconvenience and expense." Van Dusen v. Barrack, 376 U.S. 612, 616 (1964) (internal quotation marks and citation omitted). The burden is on the moving party to make a clear and convincing showing that the action is one that might have been brought in the proposed transferee forum, and that transfer would promote convenience and justice. See N.Y. Marine & Gen. Ins. Co. v. Lafarge N. Am., Inc., 599 F.3d 102, 113-14 (2d Cir. 2010) ("It is . . . appropriate that the district courts in our Circuit have consistently applied the clear and convincing evidence standard in determining whether to exercise discretion to grant a transfer motion."); Fteja v. Facebook, Inc., 841 F. Supp. 2d 829, 832 (S.D.N.Y. 2012). Furthermore, "a plaintiff's choice of forum is presumptively entitled to substantial deference. Indeed, our legal system has traditionally deferred to the plaintiff's choice of forum, and 'unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed.'" Gross v. British Broad. Corp., 386 F.3d 224, 230 (2d Cir. 2004) (quoting Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 508 (1947)) (citing Iragorri v. United Techs. Corp., 274 F.3d 65, 70-71 (2d Cir. 2001) (en banc)).

A § 1404(a) motion to transfer requires a court to undertake a two-part inquiry. It must first determine "whether the action to be transferred 'might have been brought' in the transferee court." Fuji Photo Film Co. v. Lexar Media, Inc., 415 F. Supp. 2d 370, 373 (S.D.N.Y. 2006) (quoting Berman v. Informix Corp., 30 F. Supp. 2d 653, 656 (S.D.N.Y. 1998)). If the answer to that question is yes, a court must then determine whether transfer is warranted in the interest of justice and for the convenience of

30

the parties and witnesses. <u>Barnum v. Mosca</u>, No. 08-CV-0567, 2009 WL 982579, at *5 (N.D.N.Y. Apr. 13, 2009) (Kahn, J.) (citing <u>Fuji Photo</u>, 415 F. Supp. 2d at 373). Among the factors a court may consider in determining whether to grant a § 1404(a) motion to transfer are:

> (1) the convenience of witnesses; (2) the convenience of the parties; (3) the location of relevant documents and the relative ease of access to those sources of proof; (4) the situs of the operative events in issue; (5) the availability of process to compel the attendance of unwilling witnesses; (6) the relative means of the parties; (7) the comparative familiarity of each district with the governing law; (8) the weight accorded a plaintiff's choice of forum; and (9) judicial efficiency and the interests of justice.

<u>Rescuecom Corp. v. Chumley</u>, 522 F. Supp. 2d 429, 449 (N.D.N.Y. 2007) (citation omitted). These "factors do not comprise an exclusive list, nor are they to be applied in a mechanical or formulaic manner. 'Rather, they, and any other factors peculiar to the particular case in question, serve as guideposts to [a] [c]ourt's informed exercise of discretion.'" <u>Id.</u> at *3 (quoting <u>Albert Fadem Trust v. Duke Energy Corp.</u>, 214 F. Supp. 2d 341, 343 (S.D.N.Y. 2002)).

### b. Whether the Action "Might Have Been Brought" in the Transferee Court

Defendant contends that the New York Action "might have been brought" in the District of Minnesota. Mem. at 12. Plaintiffs do not challenge this contention in their Response. <u>See generally</u> Resp. Because the Court finds that the convenience of the witnesses and parties, and the interests of justice, does not weigh in favor of a change in venue, the Court does not determine whether the New York Action "might have been brought" in the District of Minnesota.

### c. Application of the Relevant Factors

#### i. Locus of the Operative Facts

"The locus of operative facts is a primary factor in determining whether to transfer venue." <u>Am. S.S. Owners Mut. Prot. & Indem. Ass'n v. Lafarge N. Am., Inc.</u>, 474 F. Supp. 2d 474, 485 (S.D.N.Y. 2007). Along with the location of material witnesses, this factor has a bearing on where the "center of

gravity" of the action rests. Id. "In determining the locus of operative facts a court must look to the site of events from which the claim arises." Mastercard Int'l, Inc. v. Lexcel Solutions, Inc., No. 03 Civ. 7157, 2004 WL 1368299, at *6 (S.D.N.Y. June 16, 2004) (internal quotation marks and citation omitted). The Court agrees with those district courts in this Circuit that have held that, "in patent cases, the locus of operative facts usually lies where *either* the patent-in-suit *or* the allegedly infringing product was designed, developed, and produced." Children's Network, LLC v. PixFusion LLC, 722 F. Supp. 2d 404, 413 (S.D.N.Y. 2010); accord, e.g., EasyWeb Innovations, LLC v. Facebook, Inc., 888 F. Supp. 2d 342, 354 (E.D.N.Y. 2012); Audiovox Corp. v. S. China Enter., Inc., No. 11-CV-5142, 2012 WL 3061518, at *8 (E.D.N.Y. July 26, 2012).

Here, it is undisputed that Plaintiffs' asserted patents were developed and reduced to practice in the Northern District of New York. Dkt. No. 19 ("Kadah Declaration") ¶ 11. See generally Mem.; Reply. This District therefore is one locus of operative facts. The parties dispute, however, whether the design, development, and manufacture of the S8610U establishes the District of Minnesota as another locus of operative facts. Plaintiffs accuse only the "second series" and "third series" S8610Us of infringing its asserted patents. Resp. at 17; Hinderaker Decl. ¶ 5. According to Plaintiffs, the "first series" S8610U used a different, noninfringing circuit-board design. Resp. at 17; Hinderaker Decl. ¶ 5. Defendant has stated that only the "first series" S8610U was manufactured in Minnesota, and that the second series S8610U was developed through collaboration between Defendant's Minnesota-based engineers and Defendant's personnel abroad. Resp. at 17-18; Dkt. No. 10-2 ("Cueva Declaration") ¶ 3.

Referring to Defendant's statements regarding the various iterations of the S8610U, Plaintiffs argue that the District of Minnesota is not a locus of operative facts because: (1) the relevant S8610Us are manufactured abroad; and (2) it is not clear whether Defendant's Minnesota-based engineers or its

foreign-based personnel were primarily responsible for the design and development of the allegedly

infringing S8610U circuit board. Resp. at 17-18. While apparently conceding that the "second series"

and "third series" S8610Us are manufactured abroad, Defendant argues that Plaintiffs "ignore[] the fact

that the first series will likely be relevant to the instant action as prior art to ICM's patents." Reply at

7. However, Defendant cites no authority supporting the proposition that the location where prior art

to a patent-in-suit was developed and reduced to practice is a locus of operative facts. See generally

id. Nor could such a rule be justified in light of the substantive law governing patent-infringement

actions.

Defendant next argues that "[Plaintiffs] cannot dispute that a number of the engineers

responsible for the development and design of the accused products reside in Minnesota and that many

of the facts relevant to this action occurred in Minnesota." Id. First, the Court notes that if the relevant

S8610Us were not designed, developed, or manufactured in Minnesota, it is unclear what additional

relevant facts could have occurred there.[18] Second, where the engineers responsible for designing and

developing the S8610U currently reside is irrelevant to this factor (although it may be relevant to the

convenience-of-the-witnesses factor addressed *infra*); the relevant question is, instead, where those

engineers worked *while* designing and developing the allegedly infringing circuit board, which was first

used in the second series S8610U.[19] See Resp. at 17. To that point, Plaintiffs assert that it is unclear

---

[18] "Also relevant to consideration of [the locus-of-operative-facts] factor is the area in which the allegedly infringing device was sold or offered for sale." Defenshield Inc. v. First Choice Armor & Equip., Inc., No. 10 Civ. 1140, 2012 WL 1069088, at *13 (N.D.N.Y. Mar. 29, 2012). However, Defendant has not argued that Minnesota is a locus of operative facts on the basis of S8610U sales made there and, accordingly, has not offered any evidence regarding the percentage of S8610U sales made in Minnesota. Cf. Pecorino, 2012 WL 5989918, at *17 ("[T]he Court also looks to the presence of the defendants in the state and the percentage of sales in the forum.").

[19] The Court recognizes that one of the standards applied by district courts in this Circuit is where "the allegedly infringing product was designed, developed, and produced." E.g., Children's

from Defendant's submissions whether the relevant S8610Us' circuit board was designed and developed in Minnesota. <u>See id.</u> Defendant has identified four engineers who currently reside in Minnesota and work at Defendant's Golden Valley facility and who Defendant claims have knowledge of the relevant S8610Us' development. Woods Decl. ¶ 3. Two of those engineers admitted at their depositions, however, that they played no role in the design and development of the allegedly infringing circuit board, instead only becoming involved, if at all, in the later stages of the S8610Us' development. <u>See</u> Hinderaker Decl. Exs. B-C. The other two engineers are identified only as the co-inventors of the '972 Patent, which the S8610U practices. Woods Decl. ¶ 8. But that the S8610U practices the '972 Patent does not mean that the engineers responsible for the '972 Patent's invention were also involved in the design and development of the circuit board used in the relevant S8610Us, which Plaintiffs claim infringes the '645 and '719 Patents. That, combined with Defendant's statement that the second series S8610U was designed in collaboration with Defendant's foreign-based personnel, precludes the Court from determining that the allegedly infringing circuit board was designed and developed in Minnesota by the identified engineers. Defendant's mere assertion is not enough to meet its burden to establish that its proposed forum is a locus of operative facts. Defendant has not met that burden. Therefore, this factor weighs against transfer.

---

<u>Network</u>, 722 F. Supp. 2d at 413. However, the Court also recognizes that this standard, broadly stated, assumes that a finding of where the accused product was designed, developed, and manufactured necessarily captures where the allegedly infringing component of the product was designed, developed, and manufactured. But that is not always true where the accused product is made up of multiple discrete components each of which could have been designed, developed, and manufactured in different locations but then assembled into the completed product at a different location. If only one of the components, rather than the entire assembled product, is accused of infringing a plaintiff's patent, that component is the only aspect of the accused product relevant to the infringement analysis. The other components have no bearing on the outcome of the action; therefore, where they were designed, developed, or manufactured are not operative facts.

ii.  Plaintiffs' Choice of Forum

The Second Circuit has consistently held that "a plaintiff's choice of forum is presumptively entitled to substantial deference." Gross v. BBC, 386 F.3d 224, 230 (2d Cir. 2004); accord Wiwa v. Royal Dutch Petroleum Co., 226 F.3d 88, 101 (2d Cir. 2000) ("[A] plaintiff's choice of forum is entitled to substantial deference and should only be disturbed if the factors favoring the alternative forum are compelling."). That presumption is even stronger where the chosen forum is also the plaintiff's home district. See Pollux Holding, Ltd. v. Chase Manhattan Bank, 329 F.3d 64, 71 (2d Cir. 2003); Guidi v. Inter-Cont'l Hotels Corp., 224 F.3d 142, 146 (2d Cir. 2000); Atl. Recording Corp. v. Project Playlist, Inc., 603 F. Supp. 2d 690, 698 (S.D.N.Y. 2009). "Where a significant connection exists between the chosen forum and the underlying events, further deference is warranted to a plaintiff's forum choice." Lowe v. Housing Works, Inc., No. 11 Civ. 9233, 2013 WL 2248757, at *5 (S.D.N.Y. May 15, 2013) (citing Boehner v. Heise, 410 F. Supp. 2d 228, 241 (S.D.N.Y. 2006)).

There is no dispute that the Northern District of New York is Plaintiffs' home district.  Nor could there be: International Controls and ICM both have their principal places of business in North Syracuse, New York.  Minn. Am. Compl. ¶ 7; Am. Compl. ¶ 1-2.  Furthermore, as discussed in connection with the locus-of-operative-facts factor, the '645 Patent and '719 Patent were both conceived of and reduced to practice in the Northern District of New York, thereby creating a significant connection between the events underlying the New York Action and Plaintiffs' chosen forum.  See EasyWeb, 888 F. Supp. 2d at 350 (holding that the plaintiff's choice of forum was "entitled to great deference" where the patent-in-suit's development there rendered the forum a locus of operative facts).  Accordingly, this factor weighs heavily against transfer.

### iii. Judicial Efficiency and the Interests of Justice

Courts can consider judicial efficiency and general "interests of justice" when deciding whether to grant a motion to transfer. See Montgomery v. Tap Enterprises, Inc., No. 06 Civ. 5799, 2007 WL 576128, at *5 (S.D.N.Y. Feb. 26, 2007).

### 1) Consolidation

Defendant argues that the interest of judicial efficiency would be served by transferring the New York Action to the District of Minnesota because the Actions would be consolidated there and thus could proceed as one, thereby avoiding the duplication of work that would result from maintaining two separate but allegedly related actions. See Mem.; Reply. Furthermore, several of Defendant's arguments concerning the remaining factors in the transfer analysis depend on Defendant's assumption that the Actions will be consolidated upon transfer. But that the Minnesota district court would consolidate the Actions is entirely unclear.

Under Federal Rule of Civil Procedure 42(a), a court may consolidate two or more actions pending before it if the actions involve "a common question of law or fact." "Consolidation is inappropriate, however, if it leads to inefficiency, inconvenience, or unfair prejudice to a party." EEOC v. HBE Corp., 135 F.3d 543, 551 (8th Cir. 1998). "The party seeking consolidation bears the burden of showing that it would promote judicial convenience and economy." Powell v. Nat'l Football League, 764 F. Supp. 1351, 1359 (D. Minn. 1991). In considering whether to consolidate actions for trial, a court should consider:

> Whether the specific risks of prejudice and possible confusion [are] overborne by the risk of inconsistent adjudications of common factual and legal issues, the burden on parties, witnesses and available judicial resources of common factual and legal issues, the length of time required to conclude multiple suits as against a single one, and the relative expense to all concerned of the single-trial, multiple-trial alternatives.

Fratzke v. IC Sys., Inc., Civ. No. 05-1115, 2007 WL 1114155, at *2 (D. Minn. Apr. 13, 2007) (alteration in original) (citations omitted).

Plaintiffs contend that consolidation of the Actions is inappropriate because the issues of law and fact are different.  Resp. at 24.  Defendant, in response, points to TimeBase Pty. Ltd. v. The Thomson Corp., Civ. No. 07-1687, 2008 WL 1959061 (D. Minn. May 6, 2008).  Reply at 8.  In TimeBase, the Honorable Joan N. Ericksen, U.S. District Court Judge, who also presides over the Minnesota Action, consolidated two patent-infringement actions where the patent-in-suit in one action was a continuation-in-part of the patent-in-suit in the other action and the same parties and accused products were involved in both actions.  Id. at *1.  Here, however, it is possible that Judge Ericksen would not conclude that the Minnesota and New York Actions have common questions of fact and law justifying consolidation because, unlike in TimeBase, each Action involves the assertion of a different party's patents against different accused products.  That said, "Rule 42 requires only that there be a common question of law or fact, and consolidation is permissible *even if the claims arise out of independent transactions*."  Fratzke, 2007 WL 1114155, at *2 (emphasis added) (internal quotation marks omitted).  Thus, Judge Ericksen might instead find that those few potential factual overlaps identified by the Court during its compulsory-counterclaim analysis *supra* make consolidation of the Actions permissible.  See *supra* Part III.A.2.a.

Even if the Minnesota district court were to find a common question of law or fact, it still would need to consider whether consolidation of the Actions should be denied because of "inefficiency, inconvenience, or unfair prejudice" to Plaintiffs.  HBE Corp., 135 F.3d at 551.  Plaintiffs contend that they would be prejudiced by consolidation because: (1) the Minnesota Action, which was filed more than a year and a half before the New York Action, has progressed through many stages of discovery

and is scheduled to go to trial in mid 2014; and (2) adding Plaintiffs' patent-infringement claims to the Minnesota Action's 19 claims for, *inter alia*, infringement of Defendant's patents, copyrights, and trade dress will further complicate the case for the jurors, making it difficult for them to give Plaintiffs' claims the attention they are due. Resp. at 1, 23-24.

It is unclear what "prejudice" Plaintiffs would suffer because of the differing stages of litigation in the Actions if the two were consolidated. Plaintiffs seem to suggest that the prejudice would lie in delay—specifically, delay in the resolution of Defendant's claims against ICM in the Minnesota Action. See Resp. at 24 ("[I]t denies ICM Controls its right to a prompt trial."). According to Defendant, however, any prejudice that Plaintiffs might suffer in this regard is "self-inflicted" as a result of Plaintiffs' own delay in asserting its claims. Reply at 9.[20] Defendant's reasoning assumes that Plaintiffs had an obligation to assert their claims as soon as possible after the Minnesota Action was commenced. But the Court has already ruled that Plaintiffs' claims in the New York Action are independent of any claims in the Minnesota Action. As a result, it is indisputable that Plaintiffs' "delay" was permissible because they could have brought those claims at any time within the applicable statute of limitations. The cases that Defendant cites for the proposition that transfer is favored by Plaintiffs' failure to bring its patent-infringement claims sooner as counterclaims are on point, because in each of those cases, the

---

[20] Defendant claims that it has represented to the Minnesota district court that it would agree to an extension of the case schedule in the Minnesota Action to permit consolidation and discovery relating to Plaintiffs' claims. Reply at 9. In Defendant's view, this eliminates any prejudice to Plaintiffs. The Court finds, however, that Defendant's willingness to extend the case schedule in the Minnesota Action does not resolve the consolidation issue because Plaintiffs would also need to agree to extend the case schedule. Likewise, while Defendant argues that "courts in Minnesota frequently consolidate cases where the parties agree that consolidation is warranted," id. at 8 (citations omitted), Plaintiffs' positions in its Response to the Motion strongly suggest that it would not be willing to agree to consolidation let alone an extension of the case schedule to permit one. Thus, the Minnesota district court would in all likelihood need to decide on its own, based solely on Rule 42(a) and the case law interpreting it, whether consolidation is appropriate.

later-filed claims were clearly compulsory counterclaims to the first-filed claims. See Citigroup Inc. v. City Holding Co., 97 F. Supp. 2d 549, 554 (S.D.N.Y. 2000) (first-filed action involved claims for trademark infringement, while later-filed action involved claims for declaratory judgment of noninfringement of those same trademarks); Designs By Glory, Ltd. v. Manhattan Creative Jewelers, Inc., 657 F. Supp. 1257, 1258 (S.D.N.Y. 1987) (first-filed action involved claims for breach of express and implied warranty in connection with a sale of gold jewelry, while later-filed action involved an attempt to recover money on the sale of the same gold jewelry and damages for allegedly libelous statements the buyer made to another customer of the seller about the seller's sales practices). Nevertheless, Plaintiffs do not deny—nor could they deny—that they were aware of the Minnesota Action and the possibility of this Motion to transfer, yet still waited to bring the New York Action. Thus, it is possible that the Minnesota district court would not view any prejudice to Plaintiffs caused by a delay in resolving Defendant's claims against ICM as *unfair* prejudice.[21]

---

[21] In an related argument, but which Defendant addresses to the appropriateness of transfer generally rather than consolidation specifically, Defendant contends that "the relatively-advanced stage of discovery in the Minnesota Action actually weighs in favor of transfer." Mem. at 17; Reply at 9. Defendant cites three cases that it claims support that proposition: Designs by Glory, City Holding, and MASTR Asset Backed Securities Trust 2007-WMC1 v. WMC Mortgage, LLC, 880 F. Supp. 2d 418 (S.D.N.Y. 2012).

   The Court's reading of these cases differs from Defendant's. First, Designs By Glory does not rely on the more advanced stage of the first-filed action as a factor weighing in favor of transfer *per se*. Indeed, the district court's stated reason for viewing the fact that a discovery deadline had been set in the first-filed action as favoring transfer was merely because that action appeared to be proceeding at a quicker pace. See Designs By Glory, 657 F. Supp. at 1259-60. Furthermore, while it is unclear how much discovery had actually been completed in the first-filed action, it likely was not as much as has been completed in the Minnesota Action. Second, the City Holding court did not even refer to the more advanced stage of the first-filed action as a factor supporting transfer in that case. See generally 97 F. Supp. 2d 549. Third, MASTR is factually distinguishable. In that case, the same plaintiff filed two separate actions against the same defendant, with each action arising from the breach of substantively the same purchase agreements. See 880 F. Supp. 2d at 420, 424-25. The two actions, in short, were nearly identical. See id. at 424 ("Although the complaints in this action and the Minnesota Action are not identical, the two cases are clearly related because they involve the same parties, the same or very similar contracts, the same primary claim (repurchase), and nearly identical fact patterns."). Thus, the

In addressing Plaintiffs' second alleged source of prejudice from consolidation, the Court reaches the heart of the issues presented by this Motion to transfer. Plaintiffs' concern is that adding its patent-infringement claims to "the already complicated morass of claims pending" in the Minnesota Action would make the consolidated action "further complicated (if not . . . unmanageable)." Resp. at 23-24. As Defendant points out in its Reply, however, this argument is likely overblown. See Reply at 9-10. It is a stretch on Plaintiffs' part to assert that the consolidated action would be unmanageable—generally, confidence should be placed in district courts to oversee multifaceted actions competently. Yet, to be sure, the already complicated Minnesota Action *would* be further complicated by adding two patent-infringement claims directed toward a different party and products than the original claims. And the resulting competing infringement claims *could* cause confusion among the jury hearing the consolidated action.

In determining whether consolidation is appropriate, Minnesota district courts weigh "the specific risks of prejudice and possible confusion . . . [against] the risk of inconsistent adjudications of common factual and legal issues." Fratzke, 2007 WL 1114155, at *2. Defendant insists that trying the Actions separately could result in several inconsistencies, but the Court disagrees. A jury finding that Defendant's S8610U infringes Plaintiffs' '645 and '719 Patents would not be inconsistent with a jury finding that Plaintiffs' ICM 290 and ICM 1510 series infringe Defendant's '972 Patent and the '574 and '061 Patents, respectively. Nor is inconsistency likely in the vast majority of jury findings needed to reach the ultimate infringement finding. The Court will not speculate at this point as to who the

district court found that the more advanced stage of the first-filed action favored transfer because a large part of the discovery already completed and the substantive issues already decided would apply equally to the later-filed action. See id. at 424-25. That, however, as the Court discusses *infra*, is not the case with the Minnesota and New York Actions. Therefore, Defendant has not identified any case that directly or indirectly supports its argument that transfer is appropriate in this case *because* of the more advanced stage of the Minnesota Action.

appropriate person of ordinary skill in the art might be in each Action, but, contrary to Defendant's argument in its Reply, differing jury findings on that point would not necessarily be inconsistent because, again, the patents asserted and the inventions claimed by each are different in each Action. Reply at 10; see also *supra* Note 17. The only factual issue that overlaps, and on which inconsistent jury findings might therefore be cause for concern, is the success/consumer demand of the products at issue. But even if the circumstances come about in each Action whereby this single overlapping factual issue reaches each jury, the jury finding in the Minnesota Action—which is almost certain to conclude first—would have issue-preclusive effects in the New York Action and there would therefore be no inconsistent findings. Thus, it is not clear that the Minnesota district court would find that the risk of inconsistent findings on factual and legal issues common to the Actions would outweigh the risk of jury confusion resulting from a consolidation.

A related question—relevant in the consolidation inquiry as well as the overarching transfer inquiry—is whether there would be such a duplication of discovery if the Actions proceeded separately that it would be substantially more efficient to litigate them as one. Defendant has not convincingly shown that such duplication would occur. Although Defendant repeatedly insists that both its patent-infringement claims in the Minnesota Action and Plaintiffs' claims in the New York Action rely on substantially the same evidence, Defendant identifies only the few specific areas of overlap already discussed. The Court instead agrees with Plaintiffs' assertion that the majority of the evidence required to prove its claims will differ from the majority of the evidence required to prove Defendant's patent-infringement claims. The evidence Plaintiffs must present in the New York Action will concern primarily Plaintiffs' '645 and '719 Patents and the allegedly infringing aspects of the S8610U's circuit board. Defendant's patents simply are irrelevant to the New York Action. And importantly, Plaintiffs

assert, and Defendant does not dispute, that: (1) no discovery has been conducted in the Minnesota Action regarding the '645 and '719 Patents; (2) no depositions have been taken and no interrogatories have been served and answered regarding the S8610U's allegedly infringing circuit board; and (3) none of the relevant claims in Plaintiffs' '645 and '719 Patents have been, or will be, construed in the Minnesota Action. Hinderaker Decl. ¶¶ 4, 6, 8.[22] In the Minnesota Action, on the other hand, Defendant must present evidence pertaining to its patents and the allegedly infringing features of Plaintiffs' ICM 290 and ICM 1510 series. Plaintiffs' patents are irrelevant to the Minnesota Action. Thus, the bulk of the discovery that must be conducted in the New York Action has not been, nor should be, conducted in the Minnesota Action. The Court concludes that Defendant has not adequately demonstrated that consolidation would occur.

### 2) Calendar Congestion

"Although certainly not decisive, docket conditions or calendar congestion of both the transferee and transferor districts is a proper factor and is accorded some weight." Neil Bros. Ltd. v. World Wide Lines, Inc., 425 F. Supp. 2d 325, 334 (E.D.N.Y. 2006) (internal quotation marks and citation omitted). Plaintiffs have presented evidence from the September 2011 Judicial Caseload Profile that demonstrates the calendar congestion in both the District of Minnesota and the Northern District of New York. Hinderaker Decl. Ex. G. The Court finds that this evidence weighs in favor of transfer. Although Plaintiffs point to the statistics showing that, in terms of weighted filings, the Northern District of New

---

[22] See also Hinderaker Decl. ¶ 12 ("I expect that discovery in [the New York Action] will focus on (1) the conception and reduction to practice of the invention of the '645 and '719 patents, which was not a subject of discovery in the Minnesota Action, (2) the validity of the '645 and '719 patents, which was not a subject of discovery in the Minnesota Action, and (3) whether [Defendant's] accused products meet the claims limitations of the '645 and '719 patents, which was not a subject of the Minnesota Action.").

York has a relatively lighter caseload,[23] they ignore the statistics showing that civil cases proceed to disposition generally, and to trial specifically, more slowly in the Northern District of New York.[24]

3) Conclusion

Defendant insists that "[i]t makes little sense for a new court to learn a case already progressing in another competent court." Mem. at 17. But as the Court has already said many times in many different ways, the New York Action simply is not the same case as the Minnesota Action. The Minnesota district court—if it were to consolidate the Actions after a transfer—would need to learn about Plaintiffs' asserted patents and the allegedly infringing aspects of Defendant's products anew, which is no different from what the Court would need to learn if it chooses to retain the New York Action.

Defendant has not clearly established that the Actions would be consolidated if the Court were to transfer the New York Action or that trying the Actions separately would result in significant duplication of discovery efforts. The evidence of relative calendar congestion suggests that the New York Action might proceed more quickly in the District of Minnesota even if it remained unconsolidated, but this factor weighs only weakly in favor of transfer.

---

[23] In December 2011, the Northern District of New York had 425 weighted filings, while the District of Minnesota had 596 weighted filings. See Hinderaker Decl. Ex. G.

[24] In December 2011, the median time for civil cases to go from filing to final disposition (which includes all terminated cases, regardless of whether they were disposed of by trial or some other method) in the Northern District of New York was 10.5 months. Hinderaker Decl. Ex. G. In the District of Minnesota, it was 10.3 months. Id. Thus, while there is a difference between the two Districts on this statistic, it is not pronounced. However, in December 2011, the median time for civil cases to go from filing to trial in the Northern District of New York was 44 months, whereas in the District of Minnesota it was only 25.5 months. Id. This is a significant disparity between the two Districts.

### iv. Availability of Process to Compel Unwilling Witnesses

"In determining whether a change of venue is appropriate, [a] [c]ourt will . . . examine the ability to compel the attendance of witnesses." Neil Bros, 425 F. Supp. 2d at 332-33. The availability of compulsory process "is an important consideration in transfer motions." Int'l Sec. Exch., LLC v. Chicago Bd. Options Exch., No. 06-CV-13445, 2007 WL 1541087, at *4 (S.D.N.Y. May 24, 2007); Kwatra v. MCI, Inc., No. 96 Civ. 2491, 1996 WL 964444, at *3 (S.D.N.Y. Dec. 4, 1996) (Chin, J.) ("This factor plays an important role in the decision to transfer an action."). However, "this factor is generally relevant only with respect to third-party witnesses, since employees of the parties will as a practical matter be available in any venue by virtue of the employment relationship." Ripmax Ltd. v. Horizon Hobby, Inc., No. 07-CV-0386, 2007 WL 2049033, at *4 (D. Conn. June 25, 2007) (internal quotation marks omitted).

"Rule 45(b)(2) and 45(c)(3)(A)(ii) of the Federal Rules of Civil Procedure prohibit a subpoena from directing a witness to travel more than 100 miles." EasyWeb, 888 F. Supp. 2d at 354; accord Pecorino, 2012 WL 5989918, at *17 ("A district court can only subpoena nonparty witnesses within its district or within 100 miles of the district." (citing FED. R. CIV. P. 45(c)(3)(B)(ii))). Defendant identifies seven third-party witnesses that it contends possess relevant information: Wayne Combustion Systems; R.E. Beckett Corporations; Johnstone Supply Inc.; F.W. Webb Company; Chris F. Connolly Distr. Company, Inc.; R.E. Michel Company, Inc.; and Bell Pump Service Company. Mem. at 20 (citing Woods Decl. ¶ 13). According to Defendant, these third parties have resisted complying with the parties' discovery requests. Mem. at 20; Woods Decl. ¶ 13. But Defendant has made no claim that these third parties' live testimony, rather than deposition testimony or documentary evidence, will be required or that any of these third parties would be unwilling to give live testimony if needed. See Cyi,

Inc. v. Ja-Ru, Inc., 913 F. Supp. 2d 16, 25 (S.D.N.Y. 2012) (affording the availability-of-process factor little weight where the party seeking transfer made no representation that its witnesses were unwilling to testify). If these third parties are unwilling to give live testimony at trial, six of them are not within either the Court's or the Minnesota district court's subpoena power, while one, Bell Pump Service Company, is within the Court's subpoena power.[25] Therefore, this factor weighs against transfer, but only slightly.

### v. Convenience of the Witnesses

Convenience of the witnesses "is probably the single-most important factor in the analysis of whether transfer should be granted." Cower v. Albany Law Sch. of Union Univ., No. 04 Civ. 0643, 2005 WL 1606057, at *2 (S.D.N.Y. July 8, 2005) (internal quotation marks omitted); accord Neil Bros. Ltd., 425 F. Supp. 2d at 329 (citation omitted). Moreover, "[t]he convenience of non-party witnesses

---

[25] According to subpoenas issued to each of these third parties by various other U.S. District Courts in connection with the Minnesota Action: (1) Wayne Combustion Systems is located in Fort Wayne, Indiana; (2) R.E. Beckett Corporation is located in Elyria, Ohio; (3) Johnstone Supply Inc. is located in Portland, Oregon; (4) F.W. Webb Company is located in Boston, Massachusetts; (5) Chris F. Connolly Distr. Company, Inc., is located in North Arlington, New Jersey; (6) R.E. Michel Company, Inc., is located in Glen Burnie, Maryland; and (7) Bell Pump Service Company is located in Hartford, Connecticut. See Hinderaker Decl. Ex. F.

Plaintiffs state that "[n]one of these companies are subject to the subpoena power of either the Minnesota or New York courts," but that is not true. "[T]he 100 mile radius in Rule 45 is measured in a straight line, i.e., 'as the crow flies,' and not by the usual driving route." Universitas Educ., LLC v. Nova Grp., Inc., No. 11 Civ. 1590, 2013 WL 57892, at *2 (S.D.N.Y. Jan 4, 2013) (citing cases). The Court takes judicial notice that Hartford, Connecticut is approximately 80 miles from Albany, New York as the crow flies and therefore is within the Court's subpoena power pursuant to Rule 45. See FED. R. EVID. 201(b)(2) ("The court may judicially notice a fact that is not subject to reasonable dispute because it: . . . (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."); see also Canadian St. Regis Band of Mohawk Indians v. New York, No. 82-CV-0783, 2013 WL 3992830, at *11 (N.D.N.Y. July 23, 2013) (Kahn, J.) ("[T]he 'traditional textbook treatment' of Rule 201 has included two categories of judicial notice: 'matters of common knowledge' and 'facts capable of verification.'" (quoting United States v. Bari, 599 F.3d 176, 180 (2d Cir. 2010))).

is accorded more weight than that of party witnesses." ESPN, Inc. v. Quiksilver, Inc., 581 F. Supp. 2d 542, 546 (S.D.N.Y. 2008) (quoting Indian Harbor Ins., Co. v. Factory Mut. Ins. Co., 419 F. Supp. 2d 395, 402 (S.D.N.Y. 2005)); accord Cyi, 913 F. Supp. 2d at 22; Payless Shoesource, Inc. v. Avalon Funding Corp., 666 F. Supp. 2d 356, 364 (E.D.N.Y. 2009). "Because of the importance of this factor, the party seeking transfer must clearly specify the key witnesses to be called and make a general statement of what their testimony will cover." Excelsior Designs, Inc. v. Sheres, 291 F. Supp. 2d 181, 185-86 (E.D.N.Y. 2003) (internal quotation marks and citations omitted); accord Berger v. Cushman & Wakefield of Pa., Inc., No. 12 Civ. 9224, 2013 WL 4565256, at *5 (S.D.N.Y. Aug. 28, 2013) ("[A] court must necessarily be provided some idea of what the testimony of important witnesses shall be; accordingly, a party seeking to rely on the convenience of witnesses factor must identify the material witnesses and supply a general description of what their testimony will cover." (internal quotation marks and citation omitted)). "In considering the convenience of the witnesses, [a c]ourt should 'not merely tally the number of witnesses who reside in the current forum in comparison to the number located in the proposed transferee forum. Instead, [a c]ourt must qualitatively evaluate the materiality of the testimony that the witnesses may provide." Neil Bros., 425 F. Supp. 2d at 329 (quoting Herbert Ltd. P'ship v. Elec. Arts Inc., 325 F. Supp. 2d 282, 286 (S.D.N.Y. 2004)). In the context of a patent-infringement suit, a court should give particular consideration to individuals who can testify about the technology of the allegedly infringing inventions. See Pecorino v. Vutec Corp., No. 11-CV-6312, 2012 WL 5989918, at *11 (S.D.N.Y. Nov. 30, 2012) ("In an infringement action, the most critical witnesses may be 'those officers and employees who were involved in the design, production, and sale of the [allegedly infringing] products.'" (quoting ESPN, 581 F. Supp. 2d at 548)); cf. Fuji Photo, 415 F. Supp. 2d at 373 ("The key issues in a patent infringement suit involve the technology of the inventions

claimed in the patents-in-suit.").

As mentioned *supra*, Defendant has not claimed that the third-party witnesses it has subpoenaed in the Minnesota Action would need to present live testimony in the New York Action. However, if their live testimony were required, and they would be willing to give it, the Northern District of New York likely would be a more convenient forum for a majority of them, because four of the seven are located on the east coast. See *supra* Note 25. Defendant has not identified any other third parties whose testimony might be required at trial. See generally Mem.; Reply.

Despite this factor's primary focus on the convenience of nonparty witnesses, "the convenience of party-witnesses is still relevant and thus not wholly insignificant." Pilevesky v. Suntrust Bank, No. 10 Civ. 2290, 2010 WL 4879006, at *3 (E.D.N.Y. Nov. 22, 2010). For the reasons already discussed *supra*, it is unclear whether Defendant's four employee witnesses have knowledge material to the design and development of the S8610Us' infringing circuit board. The Court therefore does not assign much weight to their potential inconvenience.

Plaintiffs identify Kadah and Laurie Kadah, Plaintiffs' Chief Financial Officer, among other employees, as potential witnesses. Resp. at 20; Dkt. No. 19 ("Kadah Declaration") ¶¶ 13-16. Each lives and works in the Syracuse, New York area. Kadah Decl. ¶¶ 13-16. These witnesses therefore would be inconvenienced by being required to travel to Minnesota.

Defendant argues, however, that Plaintiffs' employee witnesses already will have to travel to Minnesota to testify at trial in the Minnesota Action and, as a result, transferring the New York Action will actually reduce their inconvenience because they can then testify only once instead of twice. See Mem. at 19. But Plaintiffs' employee witnesses would need to testify but once in the District of Minnesota only if the Actions were consolidated after a transfer of the New York Action. If the Actions

are not consolidated, these witnesses could be inconvenienced by having to travel to the District of Minnesota twice, instead of only once, to give their testimony. The Court has already determined that Defendant has not adequately shown that consolidation of the Actions would occur.

Therefore, this factor weighs against transfer.

.                    vi. Convenience of the Parties

Courts in this Circuit have consistently held that "[w]here transfer would merely shift the inconvenience from one party to the other," a plaintiff's choice of venue should remain undisturbed. Wagner v. N.Y. Marriott Marquis, 502 F. Supp. 2d 312, 316 (N.D.N.Y. 2007); see also, e.g., EasyWeb, 888 F. Supp. 2d at 352; Berger, 2013 WL 4565256, at *4 ("[W]here a venue change would merely 'shift the inconvenience from party to another,' the balance cuts against transfer." (quoting Orb Factory, Ltd. v. Design Sci. Toys, Ltd., 6 F. Supp. 2d 203, 209 (S.D.N.Y. 1998))). Both International Controls and ICM have their principal place of business in the Northern District of New York, which is also home to Plaintiffs' party witnesses. Am. Compl. ¶¶ 1-2; Resp. at 20. Defendant, on the other hand, has its principal place of business in Morristown, New Jersey. Minn. Am. Compl. ¶ 6; Am. Compl. ¶ 3. As already mentioned, Defendant's identified party witnesses all reside in the District of Minnesota, where they work at Defendant's Golden Valley facility. Mem. at 18 (citing Woods Decl. ¶ 8). Based on principal place of business alone, then, the Northern District of New York appears to be more convenient not only for Plaintiffs but also for Defendant. However, "[t]he convenience of the parties is often connected to the convenience of their respective witnesses." Cyi, 913 F. Supp. 2d at 25 (internal quotation marks and citation omitted). Nevertheless, even giving Defendant the benefit of the doubt that all four of its identified party witnesses will give testimony material to the infringing aspects of the S8610U, for the reasons discussed *supra*, transferring the New York Action to the District of

Minnesota would simply shift the inconvenience from Defendant to Plaintiff. Therefore, this factor weighs against transfer. See Wagner, 502 F. Supp. 2d at 316 (holding that where "both parties are equally inconvenienced regarding venue," the convenience-of-the-parties factor weighs in favor of retaining the action in the plaintiff's chosen forum).

### vii.  Relative Means of the Parties

"Where an apparent disparity exists between the parties, such as when an individual sues a large corporation, the court should consider the relative means of the parties." Berger, 2013 WL 4565256, at *11 (quoting Schwartz v. Marriott Hotel Servs., Inc., 186 F. Supp. 2d , 251 (E.D.N.Y. 2002)) (internal quotation marks omitted); accord Defenshield, 2012 WL 1069088, at *14.  While Plaintiffs and Defendant are both corporations, there is no denying that Plaintiffs are, relatively speaking, smaller corporations than Defendant.  Plaintiffs have submitted: (1) the Declaration of Kadah, the Chairman of the Board of International Controls and Chairman of the Board and Chief Executive Officer of ICM, in which he states that ICM currently employs approximately 243 people at its North Syracuse headquarters and that International Controls and ICM "have had consolidated annual revenues on average of approximately $20-26 million"; (2) Defendant's Financial Release dated December 10, 2012, stating that Defendant's expected 2012 revenues were $37.5 billion; and (3) a printout from Defendant's website stating that Defendant is a Fortune 100 company that employees approximately 132,000 people worldwide.  Kadah Decl. ¶¶ 7, 19; Hinderaker Decl. Exs. D-E.  Thus, an obvious disparity in the parties' relative means exists, and it clearly favors Plaintiffs in this analysis.

Defendant argues, however, that Plaintiffs' relative poverty actually weighs in favor of a transfer to the District of Minnesota because the Minnesota Action is already pending there.  Reply at 8-9. According to Defendant's reasoning, Plaintiffs will expend greater resources litigating two actions in

two different districts than they would litigating one action in a more distant district where they are already committed to litigation. See id. As discussed *supra*, this logic is faulty. Plaintiffs might save resources only if the Actions are consolidated upon transfer of the New York Action to the District of Minnesota, which Defendant has not adequately shown will occur.

Therefore, this factor weighs against transfer.

### viii. Relative Ease of Access to Sources of Proof

In patent-infringement cases, "[t]he location of relevant documents once carried significant weight in [the transfer] analysis." Defenshield, 2012 WL 1069088, at *12 (citing Advanced Fiber Techs. (AFT) Trust v. J&L Fiber Servs., Inc., No. 07-CV-1191, 2008 WL 4890377, at *4 (N.D.N.Y. Nov. 12, 2008)). However, "in today's world of faxing, scanning, and emailing documents," "the location of relevant documents is largely a neutral factor." Lafarge, 474 F. Supp. 2d at 484, cited in Tole v. Glenn Miller Prods., Inc., No. 12 Civ. 6660, 2013 WL 4006134, at *5 (S.D.N.Y. Aug. 6, 2013) ("The location of documentary evidence is typically considered a neutral factor in the transfer analysis."); see also EasyWeb, 2012 WL 3755410, at *7 (holding that the ease-of-access factor is not significant in the transfer analysis "given the technological age in which we live, with the widespread use of, among other things, electronic document production").

Therefore, on its own, the undisputed fact that documents relevant to Defendant's allegedly infringing activities are located primarily in the District of Minnesota would carry little to no weight in the Court's transfer analysis. But Defendant also argues that much of the evidence already produced in the Minnesota Action is relevant to the New York Action but limited to use in the Minnesota Action by protective order. Mem. at 15-16, 19-20. Thus, according to Defendant, this evidence is more accessible in the District of Minnesota. See id.

The Court does not find this argument to be particularly compelling. First, the argument once again depends on the assumption that the Actions would be consolidated, and as already mentioned several times, Defendant has not adequately shown that consolidation would occur after a transfer. Absent consolidation, the evidence covered by the protective order still would be unavailable for use in the transferred New York Action. Second, as the Court has already discussed *supra*, much of the evidence relevant to Plaintiffs' claims has not been, nor should be, produced in the Minnesota Action and therefore cannot be subject to the protective order. Finally, if evidence has been produced in the Minnesota Action that is relevant to the New York Action, and there is a reason why the protective order would prevent the parties from producing the evidence again in the New York Action, the parties can simply stipulate to a modification of the protective order to allow that evidence's use there. Defendant has not brought to the Court's attention any reason why the Minnesota district court would refuse to approve such a stipulation, nor can the Court conceive of any such reason. Nonetheless, because there may be some evidence already produced in the Minnesota Action that overlaps the New York Action, and because the parties might need to take certain steps to be able to make use of it in the New York Action, this factor favors transfer, but not strongly.

ix. Forum's Familiarity with the Governing Law

"[B]ecause patent law is federal law, any district court may handle a patent case with equal skill." Pecorino, 2012 WL 5989918, at *19 (S.D.N.Y. Nov. 30, 2012) (quoting Bionix Implants, Inc. v. Biomet, Inc., No. 99 Civ. 740, 1999 WL 342306, at *5 (S.D.N.Y. May 27, 1999)) (alteration in original). The parties agree that neither the District of Minnesota nor the Northern District of New York is more or less familiar with the governing law. See Mem. at 21; Resp. at 23. Therefore, this factor is neutral.

51

x. Conclusion

The Court has found that only two of the nine factors considered above weigh in favor of transfer, and neither strongly. This does not overcome the heavy weight afforded Plaintiffs' choice of forum, especially as reinforced by the Court's findings on the locus-of-operative-facts and convenience-of the-witnesses and -parties factors. As a result, Defendant's Motion, to the extent it seeks transfer of the New York Action to the District of Minnesota, is denied.

## IV.    CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that Defendant's Motion (Dkt. No. 10) is **DENIED in its entirety**; and it is further

**ORDERED**, that this case is referred back to the Honorable Andrew T. Baxter, U.S. Magistrate Judge, for a Rule 16 pretrial conference; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**


Dated:         September 09, 2013
                Albany, NY


Lawrence E. Kahn
U.S. District Judge