UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

ICM CONTROLS CORP., *et al.*,

                              Plaintiffs,

      -against-                                 5:12-CV-1766 (LEK/ATB)

HONEYWELL INTERNATIONAL INC,
*et al.*,

                              Defendants.

## MEMORANDUM-DECISION AND ORDER

### I.    INTRODUCTION

This case is a long-running patent dispute between plaintiffs ICM Controls Corp. and International Controls and Measurements Corp. (together, "ICM" or "Plaintiffs"), and defendants Honeywell International, Inc. and Resideo Technologies, Inc. (together, "Honeywell" or "Defendants").[1] ICM currently accuses Honeywell of infringing one patent related to ignition systems for gas furnaces. Dkt. No. 7 ("Amended Complaint"); U.S. Patent No. 5,889,645 (the "'645 Patent").

Presently before the court is Honeywell's motion to exclude the opinion offered by ICM's damages expert Christopher Bokhart that ICM is entitled to lost profits stemming from Honeywell's sale of their non-universal S86 family of products. Dkt. Nos. 394 ("Motion"); 394-2 ("Honeywell's Memorandum"); 394-3 ("Bokhart Report"); 406 ("Opposition"); 419 ("Reply"). For the reasons that follow, the Court grants Honeywell's Motion.

---

[1] Resideo was added as a defendant in April 2019, after Honeywell spun off Resideo and assigned it aspects of Honeywell's business relevant to this suit. Dkt. Nos. 249, 251. For consistency, the Court continues to refer to Defendants as "Honeywell," as it has in previous opinions.

## II.   BACKGROUND

A detailed account of this case's facts and procedural history can be found in the Court's June 14, 2017 summary judgment decision, Dkt. No. 146 ("June 2017 Memorandum-Decision and Order"), and its December 3, 2019 decision, Dkt. No. 316 ("December 2019 Memorandum-Decision and Order").

## III.   LEGAL STANDARD

### A.   Motion to Exclude

Under Rule 702 of the Federal Rules of Evidence, the Court is charged with a "gatekeeping" obligation with respect to expert testimony. Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 597 (1993). The trial judge must ensure "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." Id. Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. "To determine whether a witness qualifies as an expert, courts compare the area in which the witness has superior knowledge, education, experience, or skill, with the subject matter of the proffered testimony." United States v. Tin Yat Chin, 371 F.3d 31, 40 (2d Cir. 2004). "Generally speaking, expert qualifications are liberally construed." Rondout Valley Cent. Sch. Dist. v. Coneco Corp., 321 F. Supp. 2d 469, 474 (N.D.N.Y. 2004) (citations omitted).

"Under *Daubert*, factors relevant to determining reliability include the theory's testability, the extent to which it has been subjected to peer review and publication, the extent to

2

which a technique is subject to standards controlling the technique's operation, the known or potential rate of error, and the degree of acceptance within the relevant scientific community." Restivo v. Hessemann, 846 F.3d 547, 575–576 (2d Cir. 2017) (internal quotation marks and citations omitted). The reliability inquiry is a "flexible one," Daubert, 509 U.S. at 594, and the factors to be considered "depend[] upon the particular circumstances of the particular case at issue," Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 150 (1999). "In undertaking this flexible inquiry, the district court must focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the district court's belief as to the correctness of those conclusions." Amorgianos v. Natl. R.R. Passenger Corp., 303 F.3d 256, 266 (2d Cir. 2002). "Thus, when an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony. Id. In other words, "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997). "Frequently, though, 'gaps or inconsistencies in the reasoning leading to [the expert's] opinion . . . go to the weight of the evidence, not to its admissibility.'" Restivo, 846 F.3d at 577 (quoting Campbell ex rel. Campbell v. Metro. Prop. & Cas. Ins. Co., 239 F.3d 179, 186 (2d Cir. 2001)).

### B. Lost Profits

To recover lost profits, a patentee must establish "a reasonable probability that, but for the infringement, it would have made the infringer's sales." Oiness v. Walgreen Co., 88 F.3d 1025, 1029 (Fed. Cir. 1996). It is well established that in order to show that a plaintiff is entitled to lost profits, a plaintiff must establish (1) that there was demand for the patented product, (2) that there was an absence of acceptable non-infringing substitutes, (3) its manufacturing and

marketing capability to exploit the demand, and (4) the amount of profit it would have made. Panduit Corp. v. Stahlin Bros. Fibre Works, Inc., 575 F.2d 1152, 1156 (Fed. Cir. 1978).

In addition, a plaintiff must have made a competitive product in order to be entitled to damages seeking to rectify any potential lost sales of that product. "If the patentee is not selling a product, by definition there can be no lost profits." Wechsler v. Macke Int'l Trade Inc., 486 F.3d 1286, 1293 (Fed. Cir. 2007) (internal citation omitted). "The patentee needs to have been selling some item, the profits of which have been lost due to infringing sales." Versata Software, Inc. v. SAP Am., Inc., 717 F.3d 1255, 1265 (Fed. Cir. 2013). Thus, whether the patentee sells a product that practices its patented technology or only a product that directly competes with the allegedly infringing product, it must have been selling such a product. See, e.g., DuPuy Spine, Inc. v. Medtronic Sofamor Danek, Inc., 567 F.3d 1314, 1330 (Fed. Cir. 2009).

"When the patentee does not seek to make and sell the invention, lost profits are not an appropriate measure of damages." Herbert v. Lisle Corp. 99 F.3d 1109, 1119 (Fed. Cir. 1996). "The only exception is where the patentee has the ability to manufacture and market a product, but for some legitimate reason does not." Wechsler, 486 F.3d at 1293. But, in those situations, it is well-established that "the burden on a patentee who has not begun to manufacture the patented product is commensurately heavy." Herbert, 99 F.3d at 1120.

**IV.    DISCUSSION**

Honeywell's Motion is granted. To recover lost profits, ICM must have either made a competitive product or had the ability to manufacture and market a competitive product, but for some "legitimate reason" did not. Herbert, 99 F.3d at 1119. As the parties explain, in the furnace ignition control market there are universal and non-universal ignition control products. Honeywell Mem. at 5–6; Opp'n at 5–6. Universal products are sold primarily in the aftermarket

4

distribution channel as a replacement for the customized ignition control products installed in boilers and furnaces by original equipment manufacturers ("OEMs"). Id. Non-universal products, on the other hand, are sold directly to OEMs and are customized for a particular OEM. Id. Honeywell manufactures the accused non-universal S86 ignition controls. Id.

As ICM concedes, it does not manufacture a competitive non-universal ignition control. Opp'n at 7–9. However, it argues that Mr. Bokhart's lost profits analysis should still be admissible because ICM manufactures universal ignition controls that incorporate the same base technology as Honeywell's non-universal S86 controls. Id. ICM further asserts that if Honeywell did not offer its non-universal S86 ignition controls to OEMs then ICM would have been able to fulfill those non-universal orders instead. Id. at 11–12. ICM supports this assertion by noting its ability to manufacture a non-universal ignition control and its relationships with OEMs. Id. Lastly, ICM adds that Honeywell's "domination" of the non-universal ignition controls market was the legitimate reason keeping ICM from entering this market and making a directly competitive product. Id.

As Honeywell correctly points out, the ability to make a competitive product is not the same as actually making a competitive product. Reply at 6; see, e.g., NeuroGrafix v. Brainlab, Inc., 12-CV-6075, No. 2020 WL 489529, at *5 (N.D. Ill. Jan. 30, 2020) (granting summary judgment on a lost profits claim against the patentee where the patentee may have had the capability to enter the market in question but never demonstrated concrete plans to enter the market or efforts to contact the relevant clients). Furthermore, although ICM cites to Honeywell's domination of the non-universal controls market as a legitimate reason for keeping ICM from entering the market, Opp'n at 12, ICM never argues that it attempted to enter this non-universal market by soliciting OEMs for business. See, e.g., NeuroGrafix, 2020 WL 489529, at

5

*5. These facts together suggest that Mr. Bokhart's lost profits analysis based on the sales of non-universal S86 products is merely speculative because ICM did not make or attempt to make even a single non-universal ignition control.

Both parties rely on the Federal Circuit's decision in Gyromat Corp. v. Champion Spark Plug Co. to support their positions. 735 F.2d 549 (Fed. Cir. 1984). In Gyromat, the patent at issue related to industrial spraying machines. Id. at 550. Among other things, the infringer, Champion, challenged the award of lost profits to the patentee, Gyromat, based on Gyromat's limited participation in the bidding process to obtain relevant sales. Id. at 554. In particular, Gyromat had only bid against Champion on seven of one-hundred and fifty-two infringing sales made by Champion. Id. Despite this, the court held that a failure to engage in competitive bidding on sales did not mean that Gyromat would not have made those sales if Champion had not infringed. Id. In supporting this holding, the court relied on the fact that the patentee manufactured a competing product that was widely used, and noted that because there were relatively few manufacturers in this field, the infringing sales would have gone to Gyromat instead if the infringement did not occur. Id. Here, the Court finds that Gyromat supports Honeywell's Motion because unlike Gyromat, ICM did not manufacture a competing product or attempt to enter the non-universal ignition control market. As such, Mr. Bokhart's lost profits analysis is overly speculative and will only serve to confuse the factfinder. For these reasons, the Court grants Honeywell's Motion and excludes Mr. Bokhart's lost profits opinions. See Siemens Mobility Inc. v. Westinghouse Air Brake Technologies Corporation, No. 16-CV-284, 2019 WL 9698520, at *2 (D. Del. Jan. 2, 2019) (Excluding a plaintiff's expert's lost profits opinion that created a "but for" market that was "hardly likely").

## V. CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that Honeywell's motion to exclude (Dkt. No. 394) is **GRANTED**; and it is further

**ORDERED**, that the portions of Christopher Bokhart's expert report relating to lost profits based on the sale of the accused S86 products (Dkt. No. 394-3) is **EXCLUDED**; and it is further

**ORDERED**, that the Clerk serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

DATED:   July 19, 2021

Albany, New York

LAWRENCE E. KAHN
United States District Judge

7